(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DAIMLERCHRYSLER CORP. ET AL. *v.* CUNO ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 04–1704. Argued March 1, 2006—Decided May 15, 2006\*

The city of Toledo and State of Ohio sought to encourage DaimlerChrysler Corp. to expand its Toledo operations by offering it local property tax exemptions and a state franchise tax credit. A group of plaintiffs including Toledo residents who pay state and local taxes sued in state court, alleging that the tax breaks violated the Commerce Clause. The taxpayer plaintiffs claimed injury because the tax breaks depleted the state and local treasuries to which they contributed. Defendants removed the action to District Court. Plaintiffs moved to remand to state court because, *inter alia,* they doubted whether they satisfied either the constitutional or prudential limitations on standing in federal court. The District Court declined to remand the case, concluding that plaintiffs had standing under the "municipal taxpayer standing" rule articulated in *Massachusetts* v. *Mellon,* 262 U. S. 447. On the merits, the court found that neither tax benefit violated the Commerce Clause. Without addressing standing, the Sixth Circuit agreed as to the municipal tax exemption, but held that the state franchise tax credit violated the Commerce Clause. Defendants sought certiorari to review the invalidation of the franchise tax credit, and plaintiffs sought certiorari to review the upholding of the property tax exemption. This Court granted review to consider whether the franchise tax credit violates the Commerce Clause, and directed the parties to address the issue of standing.

*Held:* Plaintiffs have not established their standing to challenge the state franchise tax credit. Because they have no standing to challenge that credit, the lower courts erred by considering their claims

---

\*Together with No. 04–1724, *Wilkins, Tax Commissioner for State of Ohio, et al.* v. *Cuno et al.,* also on certiorari to the same court.

on the merits.  Pp. 4–18.

1. State taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers.  Pp. 4–13.

(a) Before this Court can address the merits of plaintiffs' challenge, it has an obligation to assure itself that the merits question is presented in a proper Article III "case" or "controversy."  *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560.  The case-or-controversy limitation is crucial in maintaining the " 'tripartite allocation of power' " set forth in the Constitution.  *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 474.  "Article III standing . . . enforces the . . . case-or-controversy requirement."  *Elk Grove Unified School Dist.* v. *Newdow,* 542 U. S. 1, 11.  The requisite elements of standing are familiar: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen* v. *Wright,* 468 U. S. 737, 751.  Plaintiffs, as the parties now asserting federal jurisdiction, must carry the burden of establishing their standing.  Pp. 4–6.

(b) Plaintiffs' principal claim that the franchise tax credit depletes state funds to which they contribute through their taxes, and thus diminishes the total funds available for lawful uses and imposes disproportionate burdens on them, is insufficient to establish standing under Article III.  This Court has denied *federal* taxpayers standing under Article III to object to a particular expenditure of federal funds simply because they are taxpayers.  See, *e.g., Valley Forge Christian College, supra,* at 476–482.  The animating principle behind cases such as *Valley Forge* was announced in *Frothingham* v. *Mellon,* decided with *Massachusetts* v. *Mellon*, 262 U. S. 447, in which the Court observed that a federal taxpayer's "interest in the moneys of the Treasury . . . is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity."  *Id.,* at 486–487.  This rationale applies with undiminished force to state taxpayers who allege simply that a state fiscal decision will deplete the fisc and "impose disproportionate burdens on them."  See *Doremus* v. *Board of Ed. of Hawthorne,* 342 U. S. 429, 433–434.  Because state budgets frequently have an array of tax and spending provisions that may be challenged on a variety of bases, affording state taxpayers standing to press such challenges simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as " 'virtually continuing monitors of the wisdom and soundness' " of state fiscal administration, con-

trary to the more modest role Article III envisions for federal courts. See *Allen, supra,* at 760–761. Pp. 7–11.

(c) Also rejected is plaintiffs' argument that they have state taxpayer standing on the ground that their Commerce Clause challenge is just like the Establishment Clause challenge this Court permitted in *Flast* v. *Cohen,* 392 U. S. 83, 105–106. *Flast* allowed an Establishment Clause challenge by federal taxpayers to a congressional action under Art. I, §8. Although *Flast* held out the possibility that "specific [constitutional] limitations" other than the Establishment Clause might support federal taxpayer standing, *id.,* at 105, 85, only the Establishment Clause has been held to do so since *Flast,* see, *e.g., Bowen* v. *Kendrick,* 487 U. S. 589, 618. Plaintiffs' reliance on *Flast* is misguided: Whatever rights plaintiffs have under the Commerce Clause, they are fundamentally unlike the right not to contribute even "three pence" to support a religious establishment that was upheld in *Flast,* 392 U. S., at 103. Indeed, plaintiffs compare the two Clauses at such a high level of generality that almost any constitutional constraint on government power could be likened to the Establishment Clause as interpreted in *Flast. Id.,* at 105. And a finding that the Commerce Clause satisfies the *Flast* test because it often implicates governments' fiscal decisions would leave no principled way of distinguishing other constitutional provisions that also constrain governments' taxing and spending decisions. See, *e.g., Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221. Yet such a broad application of *Flast*'s exception to the general prohibition on taxpayer standing would be at odds with *Flast*'s own promise that it would not transform federal courts into forums for taxpayers' "generalized grievances." 392 U. S., at 106. Pp. 11–13.

2. Plaintiffs' status as *municipal* taxpayers does not give them standing to challenge the *state* franchise tax credit at issue.

This Court has noted with approval the standing of municipal taxpayers to enjoin the illegal use of a municipal corporation's funds. See, *e.g., Frothingham, supra,* at 486–487. But plaintiffs' attempts to leverage the notion of municipal taxpayer standing into standing to challenge the state tax credit are unavailing. Pp. 13–18.

(a) Plaintiffs argue that because state law requires revenues from the franchise tax to be distributed to local governments, the award of a credit to DaimlerChrysler reduced such distributions and thus depleted the funds of local governments to which plaintiffs pay taxes. But plaintiffs' challenge is still to the state law and state decision, not those of plaintiffs' municipality. Their argument thus suffers from the same defects that the claim of state taxpayer standing exhibits. Pp. 14–15.

(b) Also rejected is plaintiffs' claim that their standing to chal-

lenge the municipal property tax exemption supports jurisdiction over their challenge to the franchise tax credit under the "supplemental jurisdiction" recognized in *Mine Workers* v. *Gibbs,* 383 U. S. 715. *Gibbs* held that federal-question jurisdiction over a claim may authorize a federal court to exercise jurisdiction over state-law claims that may be viewed as part of the same case because they "derive from a common nucleus of operative fact" as the federal claim. *Id.,* at 725. Plaintiffs assume that *Gibbs* stands for the proposition that federal jurisdiction extends to all claims sufficiently related to a claim within Article III to be part of the same case, regardless of the deficiency that would keep the former claims out of federal court if presented on their own. This Court's general approach to the application of *Gibbs* has been markedly more cautious. See, *e.g., Exxon Mobil Corp.* v. *Allapattah Services, Inc.,* 545 U. S. ___, ___. The Court has never applied *Gibbs'* rationale to permit a federal court to exercise supplemental jurisdiction over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing, that "serv[e] to identify those disputes which are appropriately resolved through the judicial process." *Whitmore* v. *Arkansas,* 495 U. S. 149, 155. There is no reason to read *Gibbs'* language as broadly as plaintiffs urge, particularly since the Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press, see, *e.g., Allen, supra,* at 752. If standing were commutative, as plaintiffs claim, the Court's insistence that a plaintiff must demonstrate standing separately for each form of relief sought, see, *e.g., Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.,* 528 U. S. 167, 185, would make little sense when all claims for relief derive from a "common nucleus of operative fact," as they appear to have in cases like *Laidlaw*.

Such a reading of *Gibbs* would have remarkable implications. The doctrines of mootness, ripeness, and political question all originate in Article III's "case" or "controversy" language, no less than standing does. See, *e.g., National Park Hospitality Assn.* v. *Department of Interior,* 538 U. S. 803, 808. Yet if *Gibbs'* "common nucleus" formulation announced a new definition of "case" or "controversy" for all Article III purposes, a federal court would be free to entertain moot or unripe claims, or claims presenting a political question, if they "derived from" the same "operative fact[s]" as another federal claim suffering from none of these defects. Plaintiffs' reading of *Gibbs,* therefore, would amount to a significant revision of the Court's precedent interpreting Article III. With federal courts thus deciding issues they would not otherwise be authorized to decide, the "'tripartite allocation of power'" that Article III is designed to maintain, *Valley Forge, supra,* at 474, would quickly erode, and the Court's emphasis on the

Syllabus

standing requirement's role in maintaining this separation would be rendered hollow rhetoric, see *Lewis* v. *Casey,* 518 U. S. 343, 357. Pp. 15–18.

386 F. 3d 738, vacated in part and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, SOUTER, THOMAS, BREYER, and ALITO, JJ., joined. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

-----

Nos. 04–1704 and 04–1724

-----

DAIMLERCHRYSLER CORPORATION, ET AL.,
PETITIONERS

04–1704           *v.*
CHARLOTTE CUNO ET AL.


WILLIAM W. WILKINS, TAX COMMISSIONER FOR
THE STATE OF OHIO, ET AL., PETITIONERS

04–1724           *v.*
CHARLOTTE CUNO ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 15, 2006]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Jeeps were first mass-produced in 1941 for the U. S. Army by the Willys-Overland Motor Company in Toledo, Ohio. Nearly 60 years later, the city of Toledo and State of Ohio sought to encourage the current manufacturer of Jeeps—DaimlerChrysler—to expand its Jeep operation in Toledo, by offering local and state tax benefits for new investment. Taxpayers in Toledo sued, alleging that their local and state tax burdens were increased by the tax breaks for DaimlerChrysler, tax breaks that they asserted violated the Commerce Clause. The Court of Appeals agreed that a state tax credit offered under Ohio law violated the Commerce Clause, and state and local officials

and DaimlerChrysler sought review in this Court. We are obligated before reaching this Commerce Clause question to determine whether the taxpayers who objected to the credit have standing to press their complaint in federal court. We conclude that they do not, and we therefore can proceed no further.

I

Ohio levies a franchise tax "upon corporations for the privilege of doing business in the state, owning or using a part or all of its capital or property in [the] state, or holding a certificate of compliance authorizing it to do business in [the] state." *Wesnovtek Corp.* v. *Wilkins*, 105 Ohio St. 3d 312, 313, 2005–Ohio–1826, ¶2, 825 N. E. 2d 1099, 1100; see Ohio Rev. Code Ann. §5733.01 (Lexis 2005). A taxpayer that purchases "new manufacturing machinery and equipment" and installs it at sites in the State receives a credit against the franchise tax. See §5733.33(B)(1) (Lexis 1999).[1] Municipalities in Ohio may also offer partial property tax waivers to businesses that agree to invest in qualifying areas. See §5709.62(C)(1)(a) (Lexis 2005). With consent from local school districts, the partial property tax waiver can be increased to a complete exemption. See §5709.62(D)(1).

In 1998, DaimlerChrysler entered into a contract with the city of Toledo. Under the contract, DaimlerChrysler agreed to expand its Jeep assembly plant at Stickney Avenue in Toledo. In exchange, the city agreed to waive the property tax for the plant, with the consent of the two school districts in which the plant is located. Because DaimlerChrysler undertook to purchase and install "new

_____

[1] Ohio has begun phasing out the franchise tax and has discontinued offering new credits against the tax like the one DaimlerChrysler received. See §§5733.01(G), 5733.33(B)(1) (Lexis 2005). Where relevant, therefore, the citations in this opinion are to the statutes in effect at the time DaimlerChrysler made its investment.

manufacturing machinery and equipment," it was also entitled to a credit against the state franchise tax. See §5733.33(B)(1) (Lexis 1999).

Plaintiffs filed suit against various state and local officials and DaimlerChrysler in state court, alleging that these tax benefits violated the Commerce Clause. Most of the plaintiffs were residents of Toledo, who paid taxes to both the city of Toledo and State of Ohio. They claimed that they were injured because the tax breaks for DaimlerChrysler diminished the funds available to the city and State, imposing a "disproportionate burden" on plaintiffs. App. 18a, 23a, 28a.[2]

Defendants removed the action to the United States District Court for the Northern District of Ohio. See 28 U. S. C. §1441. Plaintiffs filed motions to remand the case to state court. See §1447(c). One of the grounds on which they sought remand concerned their standing. They professed "substantial doubts about their ability to satisfy either the constitutional or the prudential limitations on standing in the federal court," and urged the District Court to avoid the issue entirely by remanding. Plaintiffs' Supplemental Motion for Remand to State Court in No. 3:00cv7247, p. 13, Record Doc. 17 (footnote omitted).

The District Court declined to remand the case, concluding that, "[a]t the bare minimum, the Plaintiffs who are taxpayers have standing to object to the property tax exemption and franchise tax credit statutes under the

_____

[2] Other plaintiffs were residents of Toledo who claimed they were injured because they were displaced by the DaimlerChrysler expansion and Michigan residents who claimed injury because DaimlerChrysler would have expanded its operations in Michigan but for the Ohio investment tax credit. Plaintiffs neither identified these allegations as a basis for standing in their merits brief before this Court nor referred to them at oral argument. Any argument based on these allegations is therefore abandoned. See, *e.g., United States* v. *International Business Machines Corp.,* 517 U. S. 843, 855, and n. 3 (1996).

'municipal taxpayer standing' rule articulated in *Massa-chusetts* v. *Mellon,* 262 U. S. 447 (1923)." App. 78a (citations omitted). On the merits, the District Court found that neither tax benefit violated the Commerce Clause. See 154 F. Supp. 2d 1196 (2001). The Court of Appeals for the Sixth Circuit agreed with the District Court as to the municipal property tax exemption, but held that the state franchise tax credit violated the Commerce Clause. See 386 F. 3d 738 (2004). The Court of Appeals did not ad-dress the issue of standing.

Defendants sought certiorari to review the Sixth Cir-cuit's invalidation of the franchise tax credit and plaintiffs sought certiorari to review the upholding of the property tax exemption. We granted certiorari to consider whether the franchise tax credit violates the Commerce Clause, 545 U. S. ___ (2005); the Michigan Supreme Court had decided a similar question contrary to the Sixth Circuit's analysis here. See *Caterpillar, Inc.* v. *Dept. of Treasury*, 440 Mich. 400, 488 N. W. 2d 182 (1992). We also asked the parties to address whether plaintiffs have standing to challenge the franchise tax credit in this litigation.

## II

We have "an obligation to assure ourselves" of litigants' standing under Article III. *Friends of Earth, Inc.* v. *Laid-law Environmental Services (TOC), Inc.,* 528 U. S. 167, 180 (2000). We therefore begin by addressing plaintiffs' claims that they have standing as taxpayers to challenge the fran-chise tax credit.

### A

Chief Justice Marshall, in *Marbury* v. *Madison,* 1 Cranch 137 (1803), grounded the Federal Judiciary's authority to exercise judicial review and interpret the Constitution on the necessity to do so in the course of carrying out the judicial function of deciding cases. As Marshall explained, "[t]hose who apply the rule to particu-

lar cases, must of necessity expound and interpret that rule." *Id.,* at 177. Determining that a matter before the federal courts is a proper case or controversy under Article III therefore assumes particular importance in ensuring that the Federal Judiciary respects "'the proper—and properly limited—role of the courts in a democratic society,'" *Allen* v. *Wright,* 468 U. S. 737, 750 (1984) (quoting *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975)). If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.

This Court has recognized that the case-or-controversy limitation is crucial in maintaining the "'tripartite allocation of power'" set forth in the Constitution. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 474 (1982) (quoting *Flast* v. *Cohen,* 392 U. S. 83, 95 (1968)). Marshall again made the point early on, this time in a speech in the House of Representatives. "A case in law or equity," Marshall remarked,

> "was a term . . . of limited signification. It was a controversy between parties which had taken a shape for judicial decision. If the judicial power extended to every *question* under the constitution it would involve almost every subject proper for legislative discussion and decision; if to every *question* under the laws and treaties of the United States it would involve almost every subject on which the executive could act. The division of power [among the branches of government] could exist no longer, and the other departments would be swallowed up by the judiciary." 4 Papers of John Marshall 95 (C. Cullen ed. 1984).

As this Court has explained, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-

court jurisdiction to actual cases or controversies.'" *Raines* v. *Byrd,* 521 U. S. 811, 818 (1997) (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 37 (1976)).

The case-or-controversy requirement thus plays a critical role, and "Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Elk Grove Unified School Dist.* v. *Newdow,* 542 U. S. 1, 11 (2004). The "core component" of the requirement that a litigant have standing to invoke the authority of a federal court "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560 (1992). The requisite elements of this "core component derived directly from the Constitution" are familiar: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, *supra,* at 751. We have been asked to decide an important question of constitutional law concerning the Commerce Clause. But before we do so, we must find that the question is presented in a "case" or "controversy" that is, in James Madison's words, "of a Judiciary Nature." 2 Records of the Federal Convention of 1787, p. 430 (M. Farrand ed. 1966). That requires plaintiffs, as the parties now asserting federal jurisdiction, to carry the burden of establishing their standing under Article III.[3]

---

[3] Because defendants removed the case from state court to District Court, plaintiffs were not initially the parties that invoked federal jurisdiction. Indeed, plaintiffs initially expressed doubts as to their standing. Nonetheless, because "[w]e presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record," *Renne* v. *Geary,* 501 U. S. 312, 316 (1991) (internal quotation marks omitted), the party asserting federal jurisdiction when it is challenged has the burden of establishing it. Whatever the parties' previous positions on the propriety of a federal forum, plaintiffs, as the parties seeking to establish federal jurisdiction, must make the showings required for standing.

### B

Plaintiffs principally claim standing by virtue of their status as Ohio taxpayers, alleging that the franchise tax credit "depletes the funds of the State of Ohio to which the Plaintiffs contribute through their tax payments" and thus "diminish[es] the total funds available for lawful uses and impos[es] disproportionate burdens on" them. App. 28a; see also Brief for Respondents 24. On several occasions, this Court has denied *federal* taxpayers standing under Article III to object to a particular expenditure of federal funds simply because they are taxpayers. Thus the alleged "deprivation of the fair and constitutional use of [a federal taxpayer's] tax dollar" cannot support a challenge to the conveyance of Government land to a private religious college, *Valley Forge, supra,* at 476–482 (internal quotation marks and some brackets omitted), and "the interest of a taxpayer in the moneys of the federal treasury furnishes no basis" to argue that a federal agency's loan practices are unconstitutional, *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 478 (1938); see also *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U. S. 208 (1974); *United States* v. *Richardson,* 418 U. S. 166 (1974).

The animating principle behind these cases was announced in their progenitor, *Frothingham* v. *Mellon,* decided with *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923). In rejecting a claim that improper federal appropriations would "increase the burden of future taxation and thereby take [the plaintiff's] property without due process of law," the Court observed that a federal taxpayer's

"interest in the moneys of the Treasury . . . is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Id.,* at 486–487.

This logic is equally applicable to taxpayer challenges to expenditures that deplete the treasury, and to taxpayer challenges to so-called "tax expenditures," which reduce amounts available to the treasury by granting tax credits or exemptions. In either case, the alleged injury is based on the asserted effect of the allegedly illegal activity on public revenues, to which the taxpayer contributes.

Standing has been rejected in such cases because the alleged injury is not "concrete and particularized," *Defenders of Wildlife*, *supra,* at 560, but instead a grievance the taxpayer "suffers in some indefinite way in common with people generally," *Frothingham*, *supra,* at 488. In addition, the injury is not "actual or imminent," but instead "conjectural or hypothetical." *Defenders of Wildlife*, *supra,* at 560 (internal quotation marks and citations omitted). As an initial matter, it is unclear that tax breaks of the sort at issue here do in fact deplete the treasury: The very point of the tax benefits is to spur economic activity, which in turn *increases* government revenues. In this very action, the Michigan plaintiffs claimed that they were injured because they lost out on the added revenues that would have accompanied DaimlerChrysler's decision to expand facilities in Michigan. See n. 2, *supra.*

Plaintiffs' alleged injury is also "conjectural or hypothetical" in that it depends on how legislators respond to a reduction in revenue, if that is the consequence of the credit. Establishing injury requires speculating that elected officials will increase a taxpayer-plaintiff's tax bill to make up a deficit; establishing redressability requires speculating that abolishing the challenged credit will redound to the benefit of the taxpayer because legislators will pass along the supposed increased revenue in the form of tax reductions. Neither sort of speculation suffices to support standing. See *ASARCO Inc.* v. *Kadish,* 490 U. S. 605, 614 (1989) (opinion of KENNEDY, J.) ("[I]t is pure speculation whether the lawsuit would result in any actual tax relief for respondents");

*Warth,* 422 U. S., at 509 (criticizing a taxpayer standing claim for the "conjectural nature of the asserted injury").

A taxpayer-plaintiff has no right to insist that the government dispose of any increased revenue it might experience as a result of his suit by decreasing his tax liability or bolstering programs that benefit him. To the contrary, the decision of how to allocate any such savings is the very epitome of a policy judgment committed to the "broad and legitimate discretion" of lawmakers, which "the courts cannot presume either to control or to predict." *ASARCO, supra,* at 615 (opinion of KENNEDY, J.). Under such circumstances, we have no assurance that the asserted injury is "imminent"—that it is "certainly impending." *Whitmore* v. *Arkansas,* 495 U. S. 149, 158 (1990) (internal quotation marks omitted); see *Defenders of Wildlife,* 504 U. S., at 564–565, n. 2.

The foregoing rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers. We indicated as much in *Doremus* v. *Board of Ed. of Hawthorne,* 342 U. S. 429 (1952). In that case, we noted our earlier holdings that "the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect" to support standing to challenge "their manner of expenditure." *Id.,* at 433. We then "reiterate[d]" what we had said in rejecting a federal taxpayer challenge to a federal statute "as equally true when a state Act is assailed: 'The [taxpayer] must be able to show . . . that he has sustained . . . some direct injury . . . and not merely that he suffers in some indefinite way in common with people generally.'" *Id.,* at 433–434 (quoting *Frothingham, supra,* at 488); see *ASARCO, supra,* at 613–614 (opinion of KENNEDY, J.) ("[W]e have likened state taxpayers to federal taxpayers" for purposes of taxpayer standing (citing *Doremus, supra,* at 434)).

The allegations of injury that plaintiffs make in their complaint furnish no better basis for finding standing

than those made in the cases where federal taxpayer standing was denied. Plaintiffs claim that DaimlerChrysler's tax credit depletes the Ohio fisc and "impos[es] disproportionate burdens on [them]." App. 28a. This is no different from similar claims by federal taxpayers we have already rejected under Article III as insufficient to establish standing. See, *e.g., Frothingham,* 262 U. S., at 486 (allegation of injury that the effect of government spending "will be to increase the burden of future taxation and thereby take [plaintiff's] property without due process of law").

State policymakers, no less than their federal counterparts, retain broad discretion to make "policy decisions" concerning state spending "in different ways . . . depending on their perceptions of wise state fiscal policy and myriad other circumstances." *ASARCO, supra,* at 615 (opinion of KENNEDY, J.). Federal courts may not assume a particular exercise of this state fiscal discretion in establishing standing; a party seeking federal jurisdiction cannot rely on such "[s]peculative inferences . . . to connect [his] injury to the challenged actions of [the defendant]," *Simon,* 426 U. S., at 45; see also *Allen,* 468 U. S*.,* at 759. Indeed, because state budgets frequently contain an array of tax and spending provisions, any number of which may be challenged on a variety of bases, affording state taxpayers standing to press such challenges simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as "'virtually continuing monitors of the wisdom and soundness'" of state fiscal administration, contrary to the more modest role Article III envisions for federal courts. See *id.,* at 760–761 (quoting *Laird* v. *Tatum,* 408 U. S. 1, 15 (1972)).

For the foregoing reasons, we hold that state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as

taxpayers.[4]

## C

Plaintiffs argue that an exception to the general prohibition on taxpayer standing should exist for Commerce Clause challenges to state tax or spending decisions, analogizing their Commerce Clause claim to the Establishment Clause challenge we permitted in *Flast* v. *Cohen,* 392 U. S. 83. *Flast* held that because "the Establishment Clause . . . specifically limit[s] the taxing and spending power conferred by Art. I, §8," "a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of" the Establishment Clause. *Id.,* at 105–106. *Flast* held out the possibility that "other specific [constitutional] limitations" on Art. I, §8, might surmount the "barrier to suits against Acts of Congress brought by individuals who can assert only the interest of federal taxpayers." 392 U. S., at 105, 85. But as plaintiffs candidly concede, "only the Establishment Clause" has supported federal taxpayer suits since *Flast.* Brief for Respondents 12; see *Bowen* v. *Kendrick,* 487 U. S. 589, 618 (1988) ("Although we have considered the problem of standing and Article III limitations on federal jurisdiction many times since *[Flast]*, we have consistently adhered to *Flast* and the narrow exception it

_____

[4] The majority of the Courts of Appeals to have considered the issue have reached a similar conclusion. See, *e.g., Booth* v. *Hvass*, 302 F. 3d 849 (CA8 2002); *Board of Ed. of Mt. Sinai Union Free School Dist.* v. *New York State Teachers Retirement System*, 60 F. 3d 106 (CA2 1995); *Colorado Taxpayers Union, Inc.* v. *Romer*, 963 F. 2d 1394 (CA10 1992); *Taub* v. *Kentucky*, 842 F. 2d 912 (CA6 1988); *Korioth* v. *Briscoe*, 523 F. 2d 1271 (CA5 1974); but cf. *Arakaki* v. *Lingle*, 423 F. 3d 954, 967–969 (CA9 2005) (finding state taxpayer standing in light of *Hoohuli* v. *Ariyoshi*, 741 F. 2d 1169 (CA9 1984), but noting that JUSTICE KENNEDY's opinion in *ASARCO Inc.* v. *Kadish,* 490 U. S. 605 (1989), would "carry persuasive value" absent *Hoohuli*).

created to the general rule against taxpayer standing").

Quite apart from whether the franchise tax credit is analogous to an exercise of congressional power under Art. I, §8, plaintiffs' reliance on *Flast* is misguided: Whatever rights plaintiffs have under the Commerce Clause, they are fundamentally unlike the right not to "'contribute three pence . . . for the support of any one [religious] establishment.'" 392 U. S*.,* at 103 (quoting 2 Writings of James Madison 186 (G. Hunt ed. 1901)). Indeed, plaintiffs compare the Establishment Clause to the Commerce Clause at such a high level of generality that almost any constitutional constraint on government power would "specifically limit" a State's taxing and spending power for *Flast* purposes. 392 U. S*.,* at 105; see Brief for Respondents 14 ("In each case, the harm to be avoided by [the two clauses] is the loss of governmental neutrality"). And even if the two clauses are similar in that they often implicate governments' fiscal decisions, see *id.,* at 13–14, a finding that the Commerce Clause satisfies the *Flast* test would leave no principled way of distinguishing those other constitutional provisions that we have recognized constrain governments' taxing and spending decisions. See, *e.g., Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221 (1987) (invalidating state sales tax under the Free Press Clause). Yet such a broad application of *Flast*'s exception to the general prohibition on taxpayer standing would be quite at odds with its narrow application in our precedent and *Flast*'s own promise that it would not transform federal courts into forums for taxpayers' "generalized grievances." 392 U. S*.,* at 106.

*Flast* is consistent with the principle, underlying the Article III prohibition on taxpayer suits, that a litigant may not assume a particular disposition of government funds in establishing standing. The *Flast* Court discerned in the history of the Establishment Clause "the specific evils feared by [its drafters] that the taxing and spending

power would be used to favor one religion over another or to support religion in general." *Id.,* at 103. The Court therefore understood the "injury" alleged in Establishment Clause challenges to federal spending to be the very "extract[ion] and spen[ding]" of "tax money" in aid of religion alleged by a plaintiff. *Id.,* at 106. And an injunction against the spending would of course redress *that* injury, regardless of whether lawmakers would dispose of the savings in a way that would benefit the taxpayer-plaintiffs personally. See *Valley Forge,* 454 U. S.*,* at 514 (STEVENS, J., dissenting) ("[T]he plaintiffs' invocation of the Establishment Clause was of decisive importance in resolving the standing issue in *[Flast]*").

Plaintiffs thus do not have state taxpayer standing on the ground that their Commerce Clause challenge is just like the Establishment Clause challenge in *Flast*.

## III

Plaintiffs also claim that their status as *municipal* taxpayers gives them standing to challenge the *state* franchise tax credit at issue here. The *Frothingham* Court noted with approval the standing of municipal residents to enjoin the "illegal use of the moneys of a municipal corporation," relying on "the peculiar relation of the corporate taxpayer to the corporation" to distinguish such a case from the general bar on taxpayer suits. 262 U. S.*,* at 486–487; see *ASARCO*, 490 U. S.*,* at 613–614 (opinion of KENNEDY, J.) (reiterating distinction). Plaintiffs here challenged the municipal property tax exemption as municipal taxpayers. That challenge was rejected by the Court of Appeals on the merits, and no issue regarding plaintiffs' standing to bring it has been raised. In plaintiffs' challenge to the state franchise tax credit, however, they identify no municipal action contributing to any claimed injury. Instead, they try to leverage the notion of municipal taxpayer standing beyond challenges to munici-

pal action, in two ways.

## A

First, plaintiffs claim that because state law requires revenues from the franchise tax to be distributed to local governments, Ohio Rev. Code Ann. §5733.12 (Lexis 2005), the award of a credit to DaimlerChrysler reduced such distributions and thus depleted the funds of "local governments to which Respondents pay taxes." Brief for Respondents 16. But plaintiffs' challenge is still to the state law and state decision, not those of their municipality. We have already explained why a state taxpayer lacks standing to challenge a state fiscal decision on the grounds that it might affect his tax liability. All plaintiffs have done in recasting their claims as ones brought by municipal taxpayers whose municipalities receive funding from the State—the level of which might be affected by the same state fiscal decision—is introduce yet another level of conjecture to their already hypothetical claim of injury.

And in fact events have highlighted the peril of assuming that any revenue increase resulting from a taxpayer suit will be put to a particular use. Ohio's General Assembly suspended the statutory budget mechanism that distributes franchise tax revenues to local governments in 2001 and again in its subsequent biennial budgets. See Amended Substitute H. B. 94, 124th General Assembly §140 (2001), available at http://www.legislature.state. oh.us/BillText124/124_HB_94_ENR.pdf (all Internet materials as visited May 12, 2006, and available in Clerk of Court's case file); Amended Substitute H. B. 95, 125th General Assembly §139 (2003), available at http://www.legislature.state.oh.us/BillText125/125_HB_95 _EN2_N.pdf; Amended Substitute H. B. 66, 126th General Assembly §557.12 (2005), available at http://www. legislature.state.oh.us/BillText126/126_HB_66_EN2d.pdf. Any effect that enjoining DaimlerChrysler's credit will have on

municipal funds, therefore, will not result from automatic operation of a statutory formula, but from a hypothesis that the state government will choose to direct the supposed revenue from the restored franchise tax to municipalities. This is precisely the sort of conjecture we may not entertain in assessing standing. See *ASARCO*, *supra*, at 614 (opinion of KENNEDY, J.).

## B

The second way plaintiffs seek to leverage their standing to challenge the municipal property tax exemption into a challenge to the franchise tax credit is by relying on *Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966). According to plaintiffs, the "supplemental jurisdiction" recognized in that case supports jurisdiction over all their claims, once the District Court determined they had standing to challenge the property tax exemption. Brief for Respondents 17–18.

*Gibbs* held that federal-question jurisdiction over a claim may authorize a federal court to exercise jurisdiction over state-law claims that may be viewed as part of the same case because they "derive from a common nucleus of operative fact" as the federal claim. 383 U. S., at 725. Plaintiffs assume that *Gibbs* stands for the proposition that federal jurisdiction extends to all claims sufficiently related to a claim within Article III to be part of the same case, regardless of the nature of the deficiency that would keep the former claims out of federal court if presented on their own.

Our general approach to the application of *Gibbs*, however, has been markedly more cautious. For example, as a matter of statutory construction of the pertinent jurisidictional provisions, we refused to extend *Gibbs* to allow claims to be asserted against nondiverse parties when jurisdiction was based on diversity, see *Owen Equipment & Erection Co.* v. *Kroger,* 437 U. S. 365 (1978), and we

refused to extend *Gibbs* to authorize supplemental juris-
diction over claims that do not satisfy statutory amount-
in-controversy requirements, see *Finley* v. *United States,*
490 U. S. 545 (1989).  As the Court explained just last
Term, "[w]e have not . . . applied *Gibbs*' expansive inter-
pretive approach to other aspects of the jurisdictional
statutes."  *Exxon Mobil Corp.* v. *Allapattah Services, Inc.,*
545 U. S. ___, ___ (2005) (slip op., at 5) (applying 28 U. S. C.
§1367, enacted in 1990, to allow a federal court in a diver-
sity action to exercise supplemental jurisdiction over addi-
tional diverse plaintiffs whose claims failed to meet the
amount-in-controversy threshold).

What we have never done is apply the rationale of *Gibbs*
to permit a federal court to exercise supplemental jurisdic-
tion over a claim that does not itself satisfy those elements
of the Article III inquiry, such as constitutional standing,
that "serv[e] to identify those disputes which are appro-
priately resolved through the judicial process."  *Whitmore,*
495 U. S., at 155.  We see no reason to read the language of
*Gibbs* so broadly, particularly since our standing cases
confirm that a plaintiff must demonstrate standing for
each claim he seeks to press.  See *Allen,* 468 U. S., at 752
("[T]he standing inquiry requires careful judicial examina-
tion of a complaint's allegations to ascertain whether the
particular plaintiff is entitled to an adjudication of the
*particular claims* asserted" (emphasis added)).  We have
insisted, for instance, that "a plaintiff must demonstrate
standing separately for each form of relief sought."  *Laid-
law,* 528 U. S., at 185; see *Los Angeles* v. *Lyons,* 461 U. S.
95, 109 (1983).  But if standing were commutative, as
plaintiffs claim, this insistence would make little sense
when all claims for relief derive from a "common nucleus
of operative fact," as they certainly appear to have in both
*Laidlaw, supra,* at 175–179, and *Lyons*, *supra,* at 97–98.

Plaintiffs' reading of *Gibbs* to allow standing as to one
claim to suffice for all claims arising from the same "nu-

cleus of operative fact" would have remarkable implications. The doctrines of mootness, ripeness, and political question all originate in Article III's "case" or "controversy" language, no less than standing does. See, *e.g., National Park Hospitality Assn.* v. *Department of Interior,* 538 U. S. 803, 808 (2003) (ripeness); *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 67 (1997) (mootness); *Reservists Comm. to Stop the War,* 418 U. S., at 215 (political question). Yet if *Gibbs'* "common nucleus" formulation announced a new definition of "case" or "controversy" for all Article III purposes, a federal court would be free to entertain moot or unripe claims, or claims presenting a political question, if they "derived from" the same "operative fact[s]" as another federal claim suffering from none of these defects. Plaintiffs' reading of *Gibbs*, therefore, would amount to a significant revision of our precedent interpreting Article III. With federal courts thus deciding issues they would not otherwise be authorized to decide, the "'tripartite allocation of power'" that Article III is designed to maintain, *Valley Forge*, 454 U. S., at 474, would quickly erode; our emphasis on the standing requirement's role in maintaining this separation would be rendered hollow rhetoric. As we have explained, "[t]he actual-injury requirement would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Lewis* v. *Casey,* 518 U. S. 343, 357 (1996).

*Lewis* emphasized that "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Ibid.* Plaintiffs' theory of ancillary standing would contravene this principle. Plaintiffs failed to establish Article III injury with respect to their *state* taxes, and even if they did do so with respect

to their *municipal* taxes, that injury does not entitle them to seek a remedy as to the state taxes. As the Court summed up the point in *Lewis*, "standing is not dispensed in gross." *Id.,* at 358, n. 6.[5]

*    *    *

All the theories plaintiffs have offered to support their standing to challenge the franchise tax credit are unavailing. Because plaintiffs have no standing to challenge that credit, the lower courts erred by considering their claims against it on the merits. The judgment of the Sixth Circuit is therefore vacated in part, and the cases are remanded for dismissal of plaintiffs' challenge to the franchise tax credit.

*It is so ordered.*

---

[5] In defending the contrary position, plaintiffs rely on three cases from the Courts of Appeals. But two of those cases hold only that, once a litigant has standing to request invalidation of a particular agency action, it may do so by identifying all grounds on which the agency may have "'failed to comply with its statutory mandate.'" *Sierra Club* v. *Adams*, 578 F. 2d 389, 392 (CADC 1978) (quoting *Sierra Club* v. *Morton,* 405 U. S. 727, 737 (1972)); see also *Iowa Independent Bankers* v. *Board of Governors of Fed. Reserve*, 511 F. 2d 1288, 1293–1294 (CADC 1975). They do not establish that the litigant can, by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him. In the third case, the Court of Appeals relied substantially on the fact that "all courts possess an inherent power to prevent unprofessional conduct by those attorneys who are practicing before them" in allowing the Government to contest the division of a damages award it was ordered to pay between a plaintiff and his attorney. *Jackson* v. *United States*, 881 F. 2d 707, 710–711 (CA9 1989). That situation is rather far afield from the question before us.

1

# SUPREME COURT OF THE UNITED STATES

─────────────

Nos. 04–1704 and 04–1724

─────────────

DAIMLERCHRYSLER CORPORATION, ET AL.,
PETITIONERS
04–1704                    *v.*
CHARLOTTE CUNO ET AL.


WILLIAM W. WILKINS, TAX COMMISSIONER FOR
THE STATE OF OHIO, ET AL., PETITIONERS
04–1724                    *v.*
CHARLOTTE CUNO ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 15, 2006]

JUSTICE GINSBURG, concurring in part and concurring in the judgment.

Today's decision, the Court rightly points out, is solidly grounded in longstanding precedent, *Frothingham* v. *Mellon* (decided with *Massachusetts* v. *Mellon*), 262 U. S. 447 (1923), and *Doremus* v. *Board of Ed. of Hawthorne,* 342 U. S. 429 (1952), decisions that antedate current jurisprudence on standing to sue. See *ante*, at 7, 9. *Frothingham* held nonjusticiable a federal taxpayer's suit challenging a federal-spending program. See 262 U. S., at 487 (describing taxpayer's interest as "minute and indeterminable"). *Doremus* applied *Frothingham*'s reasoning to a state taxpayer's suit. 342 U. S., at 434. These decisions exclude from federal-court cognizance claims, not delineated by Congress, presenting generalized grievances. An exception to *Frothingham*'s rule, recognized post-*Doremus* in *Flast* v. *Cohen,* 392 U. S. 83 (1968), covers certain al-

leged violations of the Establishment Clause. The *Flast* exception has not been extended to other areas. See *Bowen* v. *Kendrick,* 487 U. S. 589, 618 (1988); cf. Enrich, Saving the States from Themselves: Commerce Clause Constraints on State Tax Incentives for Business, 110 Harv. L. Rev. 377, 417–418 (1996).

One can accept, as I do, the nonjusticiability of *Frothingham*-type federal and state taxpayer suits in federal court without endorsing as well the limitations on standing later declared in *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26 (1976) *(EKWRO), Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464 (1982), *Allen* v. *Wright,* 468 U. S. 737 (1984), and *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555 (1992). See *EKWRO*, 426 U. S., at 54–66 (Brennan, J., concurring in judgment); *Valley Forge*, 454 U. S., at 513–515 (STEVENS, J., dissenting); *Allen*, 468 U. S., at 783–795 (STEVENS, J., dissenting), and the overturned Court of Appeals opinion, *Wright* v. *Regan*, 656 F. 2d 820, 828–832 (CADC 1981) (Ginsburg, J.); *Defenders of Wildlife*, 504 U. S., at 582–585 (STEVENS, J., concurring in judgment); Sunstein, What's Standing after *Lujan*? Of Citizen Suits, "Injuries," and Article III, 91 Mich. L. Rev. 163, 203–205, 228–229 (1992) (contrasting *Lujan*, *Allen*, and *EKWRO* with *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978)); Fletcher, The Structure of Standing, 98 Yale L. J. 221, 267–270 (1988) (commenting on *Flast* and *Valley Forge*). Noting this large reservation, I concur in the judgment, and in the balance of the Court's opinion.