(Slip Opinion) OCTOBER TERM, 2016 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TOWN OF CHESTER, NEW YORK *v.* LAROE ESTATES, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 16–605. Argued April 17, 2017—Decided June 5, 2017

Land developer Steven Sherman paid $2.7 million to purchase land in the town of Chester (Town) for a housing subdivision. He also sought the Town's approval of his development plan. About a decade later, he filed this suit in New York state court, claiming that the Town had obstructed his plans for the subdivision, forcing him to spend around $5.5 million to comply with its demands and driving him to the brink of personal bankruptcy. Sherman asserted, among other claims, a regulatory takings claim under the Fifth and Fourteenth Amendments. The Town removed the case to a Federal District Court, which dismissed the takings claim as unripe. The Second Circuit reversed that determination and remanded for the case to go forward. On remand, real estate development company Laroe Estates, Inc. (respondent here), filed a motion to intervene of right under Federal Rule of Civil Procedure 24(a)(2), which requires a court to permit intervention by a litigant that "claims an interest related to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Laroe alleged that it had paid Sherman more than $2.5 million in relation to the development project and the subject property, that its resulting equitable interest in the property would be impaired if it could not intervene, and that Sherman would not adequately represent its interest. Laroe filed, *inter alia,* an intervenor's complaint asserting a regulatory takings claim that was substantively identical to Sherman's and seeking a judgment awarding Laroe compensation for the taking of Laroe's interest in the property at issue. The District Court denied Laroe's mo-

tion to intervene, concluding that its equitable interest did not confer standing. The Second Circuit reversed, holding that an intervenor of right is not required to meet Article III's standing requirements.

*Held*:

1. A litigant seeking to intervene as of right under Rule 24(a)(2) must meet the requirements of Article III standing if the intervenor wishes to pursue relief not requested by a plaintiff. To establish Article III standing, a plaintiff seeking compensatory relief must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___. The "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 734 (internal quotation marks omitted). The same principle applies when there are multiple plaintiffs: At least one plaintiff must have standing to seek each form of relief requested in the complaint. That principle also applies to intervenors of right: For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right. Thus, at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that requested by the plaintiff. That includes cases in which both the plaintiff and the intervenor seek separate money judgments in their own names. Pp. 4–6.

2. The Court of Appeals is to address on remand the question whether Laroe seeks different relief than Sherman. If Laroe wants only a money judgment of its own running directly against the Town, then it seeks damages different from those sought by Sherman and must establish its own Article III standing in order to intervene. The record is unclear on that point, and the Court of Appeals did not resolve that ambiguity. Pp. 6–8.

828 F. 3d 60, vacated and remanded.

ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 16–605

## TOWN OF CHESTER, NEW YORK, PETITIONER *v.* LAROE ESTATES, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 5, 2017]

JUSTICE ALITO delivered the opinion of the Court.

Must a litigant possess Article III standing in order to intervene of right under Federal Rule of Civil Procedure 24(a)(2)? The parties do not dispute—and we hold—that such an intervenor must meet the requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff. In the present case, it is unclear whether the intervenor seeks different relief, and the Court of Appeals did not resolve this threshold issue. Accordingly, we vacate the judgment and remand for that court to determine whether the intervenor seeks such additional relief.

I

In 2001, land developer Steven Sherman paid $2.7 million to purchase nearly 400 acres of land in the town of Chester, New York (Town). Sherman planned to build a housing subdivision called MareBrook, complete with 385 housing units, a golf course, an onsite restaurant, and other amenities. Sherman applied for approval of his plan and thus began a "journey through the Town's ever-changing labyrinth of red tape." *Sherman* v. *Chester*, 752

F. 3d 554, 557 (CA2 2014).

In 2012, Sherman filed this suit against the Town in New York state court. The suit concerned "the decade's worth of red tape put in place" by the Town and its regulatory bodies. *Id.*, at 558. According to Sherman, the Town obstructed his plans for the subdivision and forced him to spend around $5.5 million to comply with the Town's demands. *Id.*, at 558, 560. All of this, Sherman claimed, left him financially exhausted and on the brink of personal bankruptcy. *Id.*, at 560. Sherman brought nine federal- and state-law claims against the Town, including a regulatory takings claim under the Fifth and Fourteenth Amendments. See App. 98–122. The Town removed the case to a Federal District Court, which dismissed Sherman's takings claim as unripe. Opinion and Order in No. 1:12–cv–00647 (SDNY), Dkt. 14, p. 25. The Court of Appeals for the Second Circuit reversed the ripeness determination and remanded for the case to go forward. *Chester*, *supra*, at 557.[1]

On remand, real estate development company Laroe Estates, Inc. (the respondent here) filed a motion to intervene of right under Federal Rule of Civil Procedure 24(a)(2). This Rule requires a court to permit intervention by a litigant that "claims an interest related to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Laroe alleged that in 2003 it had entered into an agreement with Sherman regarding the MareBrook property. Under this agreement, Laroe was to make $6 million in payments to Sherman, secured by a mortgage on all of the development, and Sherman was to sell Laroe

––––––––––

[1] Sherman died in 2013, and his estate replaced him as the plaintiff. App. to Pet. for Cert. 21a, n. 2.

parcels of land within the proposed subdivision when the MareBrook plan was approved. However, Laroe reserved the right to terminate the entire agreement if Sherman was unable to obtain Town approval for a sufficient number of lots. While this agreement was in place and Sherman continued his futile quest for regulatory approval, Laroe paid Sherman more than $2.5 million.

In 2013, TD Bank commenced a foreclosure proceeding on Sherman's property. In an effort to save the deal, Laroe and Sherman entered into a new agreement. That agreement provided that the purchase price of the property would be the $2.5 million that Laroe had already advanced Sherman plus any amount Sherman had to pay to settle with TD Bank. Once the Town approved the plan, Laroe was required to transfer a certain number of lots back to Sherman. In addition to imposing this transfer obligation, the agreement deemed Laroe to have paid for the land in full. Laroe was also given the authority to settle the debt Sherman owed TD Bank and to terminate the agreement if the settlement failed. The settlement did fail, and TD Bank took over the property. But Laroe never terminated its agreement with Sherman.

In support of its motion to intervene, Laroe argued that, under New York law, it is "the equitable owner of the Real Property" at issue in Sherman's suit. App. 131, 135–139. Laroe asserted that its status as equitable owner gave it an interest in the MareBrook property; that its interest would be impaired if it could not intervene; and that Sherman "ha[d] his own agenda" and consequently could not adequately represent Laroe's interest. *Id.*, at 143–145. Along with its other intervention-related pleadings, Laroe filed an intervenor's complaint asserting a regulatory takings claim that was substantively identical to Sherman's. Laroe's complaint sought, among other things, a "judgment against [the Town] awarding [Laroe] damages," namely, "compensation for the taking of Laroe's interest in

the subject real property." *Id.*, at 162.

The District Court denied Laroe's motion to intervene on the ground that Laroe lacked standing to bring a takings claim "based on its status as contract vendee to the property." App. to Pet. for Cert. 57a. The District Court interpreted Second Circuit precedent—specifically, *United States Olympic Comm.* v. *Intelicense Corp.*, *S. A.*, 737 F. 2d 263, 268 (1984)—to mean that Laroe's equitable interest did not confer standing. App. to Pet. for Cert. 55a–56a.[2]

The Court of Appeals reversed. 828 F. 3d 60, 62 (CA2 2016). Acknowledging a division among the Courts of Appeals on whether an intervenor of right must meet the requirements of Article III, the Second Circuit sided with the courts that have held that Article III standing is not required. *Id.*, at 64–65.

We granted certiorari. 580 U. S. ___ (2017).

## II

Article III of the Constitution limits the exercise of the judicial power to "Cases" and "Controversies." §2, cl. 1. This fundamental limitation preserves the "tripartite structure" of our Federal Government, prevents the Federal Judiciary from "intrud[ing] upon the powers given to the other branches," and "confines the federal courts to a properly judicial role." *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___ (2016) (slip op., at 5–6). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 341 (2006).

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo*, *supra*, at

---

[2] We assume for the sake of argument only that Laroe does not have Article III standing. If resolution of this question becomes necessary on remand, the Court of Appeals will be required to determine whether the District Court's decision was correct.

___ (slip op., at 6). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 408 (2013). Our standing doctrine accomplishes this by requiring plaintiffs to "alleg[e] such a personal stake in the outcome of the controversy as to . . . justify [the] exercise of the court's remedial powers on [their] behalf." *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 38 (1976) (internal quotation marks omitted). To establish Article III standing, the plaintiff seeking compensatory relief must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, *supra*, at ___ (slip op., at 6). "Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon*, *supra*, at 38.

Our standing decisions make clear that "'standing is not dispensed in gross.'" *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 734 (2008) (quoting *Lewis* v. *Casey*, 518 U. S. 343, 358, n. 6 (1996); alteration omitted). To the contrary, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis*, *supra*, at 734 (internal quotation marks omitted); see, *e.g.*, *DaimlerChrysler*, *supra*, at 352 ("[A] plaintiff must demonstrate standing separately for each form of relief sought"); *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 185 (2000) (same); *Los Angeles* v. *Lyons*, 461 U. S. 95, 105–106, and n. 7 (1983) (a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief). The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the com-

plaint. Both of the parties accept this simple rule.[3]

The same principle applies to intervenors of right. Although the context is different, the rule is the same: For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right. Thus, at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests. This result follows ineluctably from our Article III case law, so it is not surprising that both parties accept it (as does the United States as *amicus curiae*). See Brief for Petitioner 13 (arguing that an intervenor must always demonstrate standing); Brief for Respondent 28 ("[A]n intervenor who . . . seeks relief beyond that requested by a party with standing must satisfy Article III"); Brief for United States as *Amicus Curiae* 16 (An intervenor must demonstrate its own standing if it "seek[s] damages" or "injunctive relief that is broader than or different from the relief sought by the original plaintiff(s)").

In sum, an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing. That includes cases in which both the plaintiff and the intervenor seek separate money judgments in their own names. Cf. *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 402, n. 22 (1982) (declining to address the State's standing "until [it] obtains relief different from that sought by plaintiffs whose standing has not been questioned").

That principle dictates the disposition of this case. It is

---

[3] See Brief for Petitioner 23 ("If different parties raising a single issue seek different relief, then standing must be shown for each one"); Brief for Respondent 15 ("[A] case or controversy as to one claim does not extend the judicial power to *different* claims or forms of relief").

unclear whether Laroe seeks the same relief as Sherman or instead seeks different relief, such as a money judgment against the Town in Laroe's own name. Laroe's complaint—the best evidence of the relief Laroe seeks—requests a judgment awarding damages *to Laroe*. App. 162. Unsurprisingly, Sherman requests something different: specifically, compensation for the taking of *his* interest in the property. *Id.*, at 122. In other words, as Laroe's counsel conceded at oral argument, the complaint plainly seeks separate monetary relief for Laroe directly against the Town. Tr. of Oral Arg. 43–44. And, as Laroe's counsel conceded further, if Laroe *is* "seeking additional damages in [its] own name," "at that point, an Article III inquiry would be required." *Id.*, at 47.

To be sure, at some points during argument in the Court of Appeals, Laroe made statements that arguably indicated that Laroe is not seeking damages different from those sought by Sherman. In particular, Laroe's counsel stated that he was "not saying that Sherman and [Laroe's] damages are not the same damages," and insisted that there is "exactly one fund, and the town doesn't have to do anything except turn over the fund." Tr. 16, 33; see also Reply Brief in No. 15–1086 (CA2), p. 12 (similar). At other points, however, the same counsel made statements pointing in the opposite direction. When asked directly whether "there would be separate awards to you and to the Sherman estate" if Sherman's suit was successful, Laroe's counsel admitted that he "ha[d] never contemplated how [damages] ge[t] allocated at the end of the day" and suggested bifurcated proceedings so that once liability was settled, Laroe and Sherman could "duke it out" over damages if necessary. Tr. 32–35. And in its Court of Appeals briefing, Laroe argued that it—not Sherman—would be entitled to most of the damages from the takings claim, flagging the allocation issue as one that the District Court would have to resolve. Brief for Appellant in No. 15–1086

(CA2), p. 32 ("[T]he trier of fact will have to determine the relative allocation of rights over the fund . . . . Specifically, what is the value of Sherman's bare legal title as compared to Laroe's equitable title in the subject property"); Reply Brief in No. 15–1086, at 15 ("[M]ost, if not all of the benefits" of this litigation "will accrue [to] Laroe"); see also 828 F. 3d, at 70 (noting that Sherman and Laroe "may disagree about . . . the issue of damages were they to prevail"). Taken together, these representations at best leave it ambiguous whether Laroe is seeking damages for itself or is simply seeking the same damages sought by Sherman.[4]

Unfortunately, the Court of Appeals did not resolve this ambiguity. In fact, the section of its opinion concerning standing did not discuss whether Laroe sought different relief than Sherman. *Id.*, at 64–66. Elsewhere, in a different context, the court did acknowledge Laroe's statement that it sought "essentially the same" damages as Sherman. *Id.*, at 66. But the court also found that "it is unclear from the record whether Laroe believes the Town is directly liable to Sherman or Laroe for the taking." *Ibid.*

This confusion needs to be dispelled. If Laroe wants only a money judgment of its own running directly against the Town, then it seeks damages different from those sought by Sherman and must establish its own Article III standing in order to intervene. We leave it to the Court of Appeals to address this question on remand.

---

[4] Before this Court, Laroe's counsel represented that Laroe is not seeking damages of its own and is seeking only to maximize Sherman's recovery. Tr. of Oral Arg. 43–44. But in light of the ambiguous record and the lack of a reasoned conclusion on this question from the Court of Appeals, we are not inclined to resolve it in the first instance. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) ("[W]e are a court of review, not first view").

\*　\*　\*

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*