10-3005-cv
Mahon v. Ticor Title Insurance Company

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2010

(Argued: May 16, 2011      Decided: June 25, 2012)

Docket No. 10-3005-cv

------------------------------------------------------x

DEBORAH MAHON, on behalf of herself and all others
similarly situated,

Plaintiff-Appellant,


-- v. --

TICOR TITLE INSURANCE COMPANY and TICOR TITLE INSURANCE
COMPANY OF FLORIDA,

Defendants-Appellees,

CHICAGO TITLE INSURANCE COMPANY,

Defendant.[1]

------------------------------------------------------x

B e f o r e :  WALKER, HALL, and CHIN, Circuit Judges.

Appeal from a partial judgment of the United States District

Court for the District of Connecticut (Alvin W. Thompson, Judge)

dismissing from the case Defendants-Appellees Ticor Title

Insurance Company and Ticor Title Insurance Company of Florida on

the basis that Plaintiff-Appellant Deborah Mahon lacks Article

---

[1]   The Clerk of Court is respectfully directed to amend the
case caption to read as shown above.

III standing to sue them because she does not allege that they injured her. Mahon argues that the district court erred because Article III requires only that she have suffered an injury at the hands of one, and not all, of the named defendants. We reject Mahon's argument and affirm the district court's partial judgment.

Judge HALL concurs in a separate opinion.

INGRID L. MOLL (Mathew P. Jasinski, on the brief), Motley Rice LLC, Hartford, C.T., for Plaintiff-Appellant Deborah Mahon.

STEWART I. EDELSTEIN, Cohen and Wolf, P.C., Bridgeport, C.T., for Defendants-Appellees Ticor Title Insurance Company and Ticor Title Insurance Company of Florida.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiff Deborah Mahon appeals from a partial judgment of the United States District Court for the District of Connecticut (Alvin W. Thompson, Judge) dismissing from the case Defendants-Appellees Ticor Title Insurance Company ("Ticor") and Ticor Title Insurance Company of Florida ("Ticor Florida"). The district court concluded that Mahon lacks Article III standing to sue Ticor and Ticor Florida because she does not allege that they injured her.

Mahon argues that the district court erred because, under Article III of the Constitution, a plaintiff need only demonstrate an injury resulting from the conduct of at least one

2

defendant. So long as this constitutional minimum is satisfied, Mahon contends, the plaintiff may sue certain other parties whether or not they injured her.

For the reasons that follow, we reject Mahon's argument and AFFIRM the judgment of the district court.

**BACKGROUND**

**I. Facts as Alleged in the Complaint**

Chicago Title Insurance Company ("Chicago Title") and the Ticor entities, wholly-owned subsidiaries of Fidelity National Financial, Inc., provide title insurance to individuals in the State of Connecticut. Title insurance protects against the risk of a title challenge. In mortgage transactions, lenders generally require borrowers to obtain title insurance to protect their interest in the mortgaged property.

Under Connecticut law, title insurers must file premium rate schedules with the Insurance Commissioner and charge premiums in accordance with these schedules. See Conn. Gen. Stat. § 38a-419(a), (c). Chicago Title and the Ticor entities coordinated with one another in preparing their rate schedules. Their schedules set a basic rate for new mortgages and a reduced rate for refinance transactions, which generally require the title insurer to perform less work and involve less risk.

Chicago Title and the Ticor entities routinely concealed the reduced rate for refinance transactions from their customers. In

June 2003, for example, Plaintiff-Appellant Deborah Mahon refinanced the existing mortgage on a property in Branford, Connecticut, and purchased title insurance for the property from Chicago Title. At the closing, Chicago Title's agent did not disclose to Mahon her eligibility for the discounted refinance rate and charged her the full rate.

**II. Procedural History**

On April 28, 2009, Mahon sued Chicago Title and the Ticor entities for the overcharge on behalf of herself and similarly situated individuals. She alleges a class comprised of those who paid for title insurance from Chicago Title or the Ticor entities in Connecticut and who qualified for but paid more than the reduced refinance rate. Mahon alleges that Chicago Title and the Ticor entities' practice of overcharging on title insurance for refinanced properties violates the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a). She also brings claims for unjust enrichment, breach of implied contract, and money had and received.

Mahon alleges that it was Chicago Title's conduct that injured her personally. She does not allege any dealings with the Ticor entities. Nevertheless, Mahon's complaint asserts that the Ticor entities are proper defendants in her putative class action because they are "juridically linked" to Chicago Title. In other words, because Chicago Title and the Ticor entities are

4

wholly-owned subsidiaries of the same parent company, share resources in Connecticut, coordinated in drafting their premium rate schedules, and operate in the same manner with respect to overcharging Connecticut borrowers in refinance transactions, Mahon asserts that she can represent a class of borrowers injured by Ticor and Ticor Florida, as well as borrowers injured by Chicago Title, notwithstanding her own lack of injury with respect to the Ticor entities. The juridical link doctrine stems from dicta in the Ninth Circuit's opinion in La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973). The decision recognized, but did not apply, two exceptions to the general rule that a plaintiff cannot bring a class action against parties that did not injure her. Id. at 466. One of these exceptions permits a plaintiff to bring a class action against parties that did not injure her (hereinafter "non-injurious parties") if those parties are "juridically related" to the party that did injure her, and if it would be "expeditious" to sue all the parties in one action. Id.

In response to Mahon's complaint, the Ticor entities moved to dismiss all counts against them for lack of standing.[2] They argued that Mahon lacks Article III standing to sue them because she does not allege any personal injury at their hands, and

_____

[2] The Ticor entities and Chicago Title also moved to dismiss certain claims on other grounds not relevant to this appeal.

5

because the relationship between Chicago Title and the Ticor entities as alleged in her complaint is insufficient to establish a juridical link.

The district court granted the motion, dismissing all claims against the Ticor entities. It did not, however, directly address the issue framed in the Ticor entities' motion. While the Ticor entities had argued that the allegations in Mahon's complaint were insufficient to establish a juridical link, the district court addressed whether, assuming that the allegations in the complaint did establish a juridical link, the juridical link was relevant to Article III standing. It answered this question in the negative, holding that the juridical link doctrine relates only to the question of class certification under the Federal Rules and thus has no bearing on the Article III standing inquiry. It concluded that Mahon lacks Article III standing to sue the Ticor entities whether or not they are juridically linked to Chicago Title because she suffered no injury as a result of their conduct.

Mahon moved for entry of final judgment as to the Ticor entities and for certification to appeal under Federal Rule of Civil Procedure 54(b). The district court granted the motion, finding there to be no just reason for delay.

**DISCUSSION**

On appeal, Mahon agrees with the district court that the potential presence of a juridical link between Chicago Title and the Ticor entities does not bear on her Article III standing to sue the Ticor entities. She argues, however, that the district court misconstrued Article III's requirements. Article III does not, she contends, require a plaintiff to demonstrate that she was injured by the conduct of each defendant. Rather, she argues that a plaintiff need only demonstrate injury resulting from the conduct of one defendant to pass the Article III threshold. Once the plaintiff passes this threshold, she contends, Article III does not prevent her from suing non-injurious defendants in the same suit. Because Mahon alleges that Chicago Title injured her, she argues that her lack of injury at the hands of the Ticor entities is irrelevant to the Article III inquiry.

We review de novo the district court's dismissal of Mahon's claims against the Ticor entities, accepting as true all well-pleaded material allegations of the complaint. Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009).

Article III, Section 2 of the Constitution limits the jurisdiction of the federal courts "to the resolution of 'cases' and 'controversies.'" Id. at 89. This limitation is "founded in concern about the proper -- and properly limited -- role of the courts in a democratic society." Warth v. Seldin, 422 U.S. 490,

498 (1975). "[W]hether the plaintiff has made out a 'case or controversy' between himself and the defendant . . . is the threshold question in every federal case, determining the power of the court to entertain the suit." Id. "[T]o ensure that this 'bedrock' case-or-controversy requirement is met, courts require that plaintiffs establish their 'standing' as 'the proper part[ies] to bring' suit." Selevan, 584 F.3d at 89 (quoting W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008)). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).

To satisfy the "'irreducible constitutional minimum' of standing," a plaintiff must demonstrate (1) a personal injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable decision will likely redress. Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 228 (2d Cir. 2011) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Demonstrating that the defendant's allegedly unlawful conduct caused injury to the plaintiff herself is thus generally an essential component of Article III

8

standing.[3]

Mahon's proposed interpretation of Article III -- that it permits suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff -- is unprecedented. No decision that we can discern has ever adopted such a broad interpretation of constitutional standing. Although Mahon's proposed interpretation does not depend on the juridical link doctrine, it does stem from her attempt, based on the juridical link doctrine, to bring a class action against non-injurious defendants.

As discussed briefly above, the juridical link doctrine arose from the Ninth Circuit's decision in La Mar, 489 F.2d 461. The decision addressed "whether a plaintiff having a cause of action against a single defendant can institute a class action against the single defendant and an unrelated group of defendants who have engaged in conduct closely similar to that of the single defendant on behalf of all those injured by all the defendants." Id. at 462. Relying on class certification requirements under Rule 23(a) of the Federal Rules of Civil Procedure, the court concluded that the named plaintiffs in the cases before it could

---

[3] There are various exceptions to this general principle not relevant to this case. See, e.g., Powers v. Ohio, 499 U.S. 400, 410-11 (1991) (discussing circumstances in which a plaintiff may assert claims of a third party, inter alia, with whom the plaintiff has "a close relation" and who would be hindered in bringing suit).

not bring a class action against defendants that did not injure them: "a plaintiff who has no cause of action against the defendant can not 'fairly and adequately protect the interests' of those who do have such causes of action . . . even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant." Id. at 466 (quoting Fed. R. Civ. P. 23(a)(4)). In dicta, however, the court suggested that there are two exceptions to this rule, neither applicable in the case before it. One exception covers cases in which the named plaintiff's injuries "are the result of a conspiracy or concerted schemes between the defendants," and another -- the one which gave rise to the juridical link doctrine -- covers cases in which it would be "expeditious" to combine the defendants into one action because they are "juridically related." Id. at 466. The court did not discuss the scope of these exceptions.

Although the court did not apply either of the exceptions, it did note that Article III standing issues would arise were it to have permitted the plaintiffs to bring class actions against non-injurious defendants. Id. at 464. Because it rejected the class actions on the basis of Rule 23, it assumed the presence of standing. Id. The court made clear, however, that its "assumption is not intended to foreclose the [standing] issue." Id.

Decisions adopting the juridical link doctrine in La Mar's wake have generally dealt with the Article III standing issue in one of two ways -- or ignored it altogether. First, a number of decisions have merged the issue with the Rule 23 analysis, concluding that a plaintiff entitled under the juridical link doctrine to represent a class against non-injurious defendants has Article III standing to sue the non-injurious defendants. See, e.g., Vulcan Golf, LLC v. Google Inc., 552 F. Supp. 2d 752, 762 (N.D. Ill. 2008)("Article III standing issues are inherently intertwined with the class certification determination due to the plaintiffs' invocation of the juridical link doctrine."); In re Mut. Funds Inv. Litig., 519 F. Supp. 2d 580, 586-87 & n.9 (D. Md. 2007); Hudson v. City of Chicago, 242 F.R.D. 496, 502 (N.D. Ill. 2007); Glover v. Standard Federal Bank, No. Civ. 972068 (DWF/SRN), 2001 WL 34635707, at *2-3 (D. Minn. June 11, 2001). Other decisions have maintained the distinction between class certification and Article III standing, but have held that a court should decide class certification first and treat the class as a whole as the relevant entity for Article III purposes. See, e.g., Payton v. County of Kane, 308 F.3d 673, 680-82 (7th Cir. 2002), cert. denied sub nom., Carroll County v. Payton, 540 U.S. 812 (2003); In re Relafen Antitrust Litig., 221 F.R.D. 260, 268-69 (D. Mass 2004).

Although either of these approaches could warrant reversal of the district court's decision here, we find both to be flawed. First, whether or not Rule 23 would permit a plaintiff to represent a class against non-injurious defendants cannot affect the plaintiff's Article III standing to sue the non-injurious defendants. A federal rule cannot alter a constitutional requirement. It is well established that "a plaintiff must demonstrate standing for each claim [s]he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006). Thus, with respect to each asserted claim, "[a] plaintiff must always have suffered a distinct and palpable injury to [her]self." Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 100 (1979) (internal quotation marks omitted). "In no event . . . may Congress abrogate the Art. III minima . . . ." Id.; see also Lewis v. Casey, 518 U.S. 343, 357 (1996) ("'That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (alterations in original) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976))).

Second, we also disagree with the approach that analyzes class certification before Article III standing and treats the

12

class as the relevant legal entity.  This approach is adopted and articulated most clearly in the Seventh Circuit's <u>Payton</u> decision.  In <u>Payton</u>, six former arrestees brought a putative class action against nineteen Illinois counties, challenging their practice, in accordance with state law, of imposing a bail fee in addition to the set bail amount.  308 F.3d at 675. Finding that the named plaintiffs alleged dealings with only two of the nineteen counties, the district court dismissed the class action for lack of Article III standing.[4]  <u>Id.</u> at 675-76.

The Seventh Circuit reversed.  It first noted that the juridical link doctrine could allow the named plaintiffs to represent a class that included individuals injured by other counties.  <u>Id.</u> at 677-80.  Next, it held that the district court should have addressed class certification before Article III standing and, if it were to have certified the class, should have looked only at whether the class as a whole had Article III standing to sue each defendant.  <u>Id.</u> at 680-81.

In reaching this conclusion, the Seventh Circuit relied on the Supreme Court's statement in <u>Ortiz v. Fibreboard Corp.</u>, that "class certification issues are . . . logically antecedent to Article III concerns, and themselves pertain to statutory

---

[4]     As the Seventh Circuit noted, the district court did not explain why it dismissed the plaintiffs' claims against the two counties that had allegedly injured them.  <u>Payton</u>, 308 F.3d at 676-77.

standing, which may properly be treated before Article III standing." Payton, 308 F.3d at 680 (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999)). The Seventh Circuit characterized this language as a "directive to consider issues of class certification prior to issues of standing." Id.

We do not think Ortiz stands for such a broad proposition. Ortiz involved the propriety of a mandatory limited-fund settlement class that would resolve a multitude of asbestos-related claims. 527 U.S. at 821-30. The class included both claimants with asbestos-related diseases and claimants who had been exposed to asbestos but had not yet manifested any injury. Id. at 825-26 & n.5. Objectors to the class settlement raised arguments based on issues of class certification and issues of Article III standing. Id. at 830-31. The Article III objections focused on the arguable lack of injury in fact to the exposure-only plaintiffs. Id. at 831. The Court declined to address the Article III issues. It explained that "the class certification issues are, as they were in Amchem, 'logically antecedent' to Article III concerns . . . and themselves pertain to statutory standing, which may properly be treated before Article III standing." Id. (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 612 (1997)). The Court went on to reject the class on the basis of Rule 23 concerns. Id. at 832-65.

14

The Court's language regarding the logical antecedence of class certification issues appears to us to be a description of the case before it, and not, as the <u>Payton</u> decision maintained, a general directive regarding the order in which a court should treat class certification and Article III standing in every class action.  Because the Article III concerns would arise only if the Court affirmed class certification, and because the Rule 23 class certification issues were dispositive, it was logical for the Court to treat those issues first.  The Court's recognition that, in <u>Amchem</u>, class certification issues also were "logically antecedent" to Article III concerns suggests that, in other cases, they are not.  <u>See, e.g.</u>, <u>Rivera v. Wyeth-Ayerst Labs.</u>, 283 F.3d 315, 319 & n.6 (5th Cir. 2002) (noting that standing is an inherent prerequisite to the class certification inquiry, but that "there is a limited exception for suits in which the class certification issues are 'logically antecedent to the existence of any Article III issues'" (quoting <u>Amchem</u>, 521 U.S. at 612)). Moreover, in <u>Amchem</u>, the Court made clear that it was the dispositive nature of the class certification issues in the particular case that permitted the exception to the usual rule of dealing with the Article III issues first: "the class certification issues are dispositive; because their resolution *here* is logically antecedent to the existence of any Article III issues, it is appropriate to reach them first."  521 U.S. at 612

15

(emphasis added) (internal quotation marks, citations, and alterations omitted).  The Amchem Court cited an earlier case in which, because the issue of mootness was dispositive, it had also declined to address Article III standing.  Id. (citing Arizonans for Official English v. Arizona, 520 U.S. 43, 66-67 (1997)).  As such, we think the Court's "logical antecedence" language is relevant when resolution of class certification obviates the need to decide issues of Article III standing.  We do not read it, as the Payton court did, as instructing courts to always treat class certification first and to treat the class as the relevant entity for Article III purposes.

Mahon, perhaps recognizing the flaws in the two approaches to Article III standing discussed above, embraces neither.  She argues, in essence, that there is no Article III standing problem in juridical link cases: as long as the injurious defendant is sued in the same case, Article III does not prevent a plaintiff from suing non-injurious defendants.  Mahon, however, fails to explain why a plaintiff's injury resulting from the conduct of one defendant should have any bearing on her Article III standing to sue other defendants, even if they engaged in similar conduct that injured other parties.  Cf. Blum v. Yaretsky, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind,

16

although similar, to which he has not been subject." (citing Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166-67 (1972)); see also DaimlerChrysler Corp., 547 U.S. at 335 ("[A] plaintiff must demonstrate standing for each claim [s]he seeks to press . . . ."). The only case Mahon cites to support her interpretation is Payton, which, as we discussed above, rests on the notion that courts should treat class certification before Article III standing. The case does not support Mahon's novel interpretation of Article III. Indeed, Payton's extensive discussion of the proper sequence in which a court should decide class certification and Article III standing makes clear that it did not adopt an interpretation of Article III like that which Mahon proposes here.

In sum, we decline to adopt Mahon's novel and unsupported interpretation of Article III, and conclude that the district court properly dismissed all of Mahon's claims against the Ticor entities for lack of Article III standing.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court.

17

**Hall, J., Concurring in the Judgment**

I concur with the result reached by the majority opinion because I agree that Mahon lacked Article III standing to sue the Ticor defendants. I disagree, however, with the majority's implication that the juridical link doctrine and Article III standing are wholly independent. (*See* Maj. Op. 11.) Both implicate the same jurisprudential concern—delimiting who may bring another person's case. Thus, while it is true that the mere invocation of the juridical link doctrine cannot bestow Article III standing that otherwise would be lacking, there will be cases in which the presence of a juridical link will suggest that Article III is also satisfied. While the doctrines are logically distinct, they are not necessarily independent.

Citing *inter alia Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), the majority correctly explains that a plaintiff, to prove Article III standing, must *generally* allege an injury to herself. But that rule is less universal than the majority's succinct footnote lets on. Notwithstanding *Lujan* and similar cases, which describe the general requirements for Article III standing, a long line of Supreme Court and Second Circuit cases has allowed certain plaintiffs, in certain limited situations, to bring claims that are not strictly their own. Collectively, these exceptions can helpfully be termed *jus tertii* standing, or standing premised on the permission to assert a third party's rights. *Cf.* Robert Allen Sedler, *Standing to Assert Constitutional* Jus Tertii *in the Supreme Court*, 71 Yale L.J. 599, 600 (1962).

In some cases, a plaintiff has been permitted to bring claims on behalf of a third party who is unlikely to be able to sue. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 410-11

1

(1991) (parties in a litigation allowed to raise the claims of prospective jurors to be free from discriminatory jury selection); *Eisenstadt v. Baird*, 405 U.S. 438, 443-44 (1972) (doctor prosecuted for distributing contraceptives allowed to assert rights of his patients to have access to contraceptives); *Barrows v. Jackson*, 346 U.S. 249, 257-58 (1953) (individual sued for breaching a racially restrictive covenant allowed to assert the rights of blacks in the community); *see also Campbell v. Louisiana*, 523 U.S. 392, 397 (1998) (applying *Powers* to a white defendant's challenge to the exclusion of black jurors). Other cases have permitted a plaintiff with a sufficiently "close" relationship to a third party to assert that third party's rights. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 193 (1976) (bartender challenging law permitting eighteen-year-old women, but not men, to buy 3.2% beer); *Singleton v. Wulff*, 428 U.S. 106, 114-17 (1976) (physicians challenging state statute that prohibited Medicaid payments for nontherapeutic abortions). Still others have allowed plaintiffs to bring First Amendment overbreadth challenges on behalf of others. *E.g.*, *Sec'y of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 958 (1984). Individual citizens may bring *qui tam* actions on behalf of the government, *see* 31 U.S.C. § 3730(b); *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 (2000) (False Claims Act can be regarded as "a partial assignment of the Government's damages claim," and so it is the United States' injury in fact which confers Article III standing on the *qui tam* relator), and states can bring *parens patriae* suits on behalf of their citizens, *see Connecticut v. Physicians Health Services of Connecticut, Inc.*, 287 F.3d 110, 119 (2d Cir. 2002); *but see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (state must articulate an interest

apart from the interests of the particular private parties).  Although the literal language of

*Lujan* might be read to foreclose Article III standing in all these scenarios, case law both

pre- and post-*Lujan* continues to permit these claims, notwithstanding the absence of a

direct injury to the plaintiff.[1]

It is never easy to generalize from individual exceptions, but most of the *jus tertii*

doctrines rest, as unifying principle, on an analytical distinction between claims asserting

private interests and those asserting public interests.  *See* 13B Charles Alan Wright et al.,

Federal Practice & Procedure § 3531.9 (3d ed. 2011).  "When private rights are involved,

it is easy to understand that one person cannot seek to recover on a claim that belongs to

someone else."  *Id.*  However, "when a party properly in court seeks to sustain its own

opposition to a *public act* by invoking the interests of others," courts sometimes accept

jurisdiction.  *Id.* (emphasis added).

In my view, the same distinction between public and private interests is at the core

of the juridical link doctrine.  *Washington v. Lee*, 263 F. Supp. 327 (M.D. Ala. 1966)

(three-judge panel), one of the seminal juridical link cases, allowed a class of current and

former detainees in local Alabama jails to sue a class of state sheriffs and wardens for

---

[1] I acknowledge that our circuit has said that "third-party standing requirements—unlike mootness requirements—are prudential rather than constitutional in nature." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 511 n.5 (2d Cir. 2005) (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988)).  As we explained in *Kane*, however, "the third-party standing doctrine has been considered a valuable prudential *limitation*, self-imposed by the federal courts."  843 F.2d at 643 (emphasis added).  Thus it is helpful to distinguish between *jus tertii* standing, which *grants* standing by permitting claims that a stricter reading of Article III would prohibit, and the prudential doctrine of "third-party standing," which *withdraws* standing that Article III would normally permit.

violating the detainees' constitutional rights, even though the named plaintiffs had no contact with many of the defendant class members. *Id.* at 328-29. Similarly, *Broughton v. Brewer*, 298 F. Supp. 260 (S.D. Ala. 1969) (three-judge panel), certified a class of persons "whose poverty or lack of apparent means of livelihood renders them susceptible to arrest under . . . Alabama vagrancy laws" to sue most of the state's law enforcement apparatus, despite the named plaintiffs' lack of injury at the hands of most of the defendants. *Id.* at 267 (typographical error corrected). From within this circuit, we have *DeAllaume v. Perales*, 110 F.R.D. 299 (S.D.N.Y. 1986), in which a putative class of New York state welfare recipients sought to challenge a common, state-directed method fifty-eight county commissioners used to calculate certain heating subsidies. *Id.* at 302. The lone representative plaintiff did not, of course, have a colorable claim against each defendant, but the district court granted certification because "a unified policy link[ed] the members of the proposed defendant class," and the requirements of Rule 23 had otherwise been satisfied. *Id.* at 304.

In *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 469 (9th Cir. 1973), the Ninth Circuit distinguished *Washington* and *Broughton*, explaining that certification was proper there because the defendants were "juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *Id.* at 466, 469. At its core, the "juridical link" present in *Washington* and *Broughton*, and absent in *La Mar*, was the fact that all defendants were government employees who *had* to follow a uniform state

4

policy.[2]  489 F.2d at 470.  Wright & Miller's discussion of the juridical link doctrine explicitly limits it to suits challenging individual actions that are compelled by state law:

> An exception to [the rule that at least one named plaintiff must have standing vis-à-vis each named defendant] has been made in several cases in which the defendant class was composed of public officials, however.  In these cases standing has been found even though the representative was injured by the conduct of only one of the officials because the court determined that the defendants were so closely related that they should be treated substantially as a single unit.  This approach—sometimes referred to as the "juridical link" test—applies in cases in which as a matter of law each official must act in the same manner, so that the plaintiff class claims are identical for all defendant class members.

7AA Charles Alan Wright et al., Federal Practice & Procedure § 1785.1 (3d ed. 2011)

(footnotes omitted).

To be sure, some decisions have extended the juridical link doctrine beyond its traditional public-sector locus to create private defendant classes.  *See* William D. Henderson, Comment, *Reconciling the Juridical Links Doctrine with the Federal Rules of Civil Procedure and Article III*, 67 U. Chi. L. Rev. 1347, 1356-57 (2000) (listing cases).  But the doctrine's root is in concerted government actions.  And the situations in which it has been most valuable and least controversial—suits against individuals acting pursuant to a government policy—are also situations in which the Supreme Court's Article III jurisprudence has been more accommodating to a plaintiff's attempt to sue a defendant who injured someone else.  *See* 13B Charles Alan Wright et al., Federal Practice & Procedure § 3531.9 (3d ed. 2011).  Some of the values supporting the continuing vitality

---

[2] A similar fact pattern was present in *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002), although for the reasons set forth in the majority's opinion the Seventh Circuit's basis for exercising jurisdiction in that case was unsound.  (*See* Maj. Op. 12-14.)

5

of the juridical link doctrine are also at play in the Article III context, and in that sense (and that sense only) it is true that "Article III standing issues are inherently intertwined with the class certification determination" in juridical link cases. *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 762 (N.D. Ill. 2008).

They certainly are not intertwined in the sense that *Vulcan Golf* would suggest—that the presence of a juridical link can somehow create standing. *See Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979) (" In no event . . . may Congress abrogate the Art[icle] III minima" of standing). But they are not unrelated. The canonical juridical link cases such as *Washington*, *Broughton*, and *Payton*, are cases in which numerous defendants are being sued for acting at the direction of a single governmental policy. To the extent the plaintiffs there were seeking to vindicate *public* rights, some of the justifications for a more expansive approach to standing might also come into play. Conversely, invoking the juridical link doctrine in a lawsuit attempting to vindicate *private* rights not only pushes the doctrine outside of its traditional theoretical basis, but also raises serious Article III problems.

Thus, because plaintiffs in classic public rights juridical link cases also are more likely to be able to establish one of the classic public rights exceptions to the direct-injury standing rule, I disagree with the majority's suggestion that the two doctrines are unrelated.