7/17/2025 2:16:15 PM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **24A1203.pdf** | versus | **24A1203_new.pdf** |
| **19 pages (127 KB)** | | **19 pages (125 KB)** |
| 7/14/2025 1:14:52 PM | | 7/17/2025 2:15:36 PM |

**Total Changes**

**1**

**Content**

1  Replacement

0  Insertions

0  Deletions

**Styling and Annotations**

0  Styling

0  Annotations

Go to First Change (page 4)

# SUPREME COURT OF THE UNITED STATES

―――――

No. 24A1203

―――――

## LINDA McMAHON, SECRETARY OF EDUCATION, ET AL. *v.* NEW YORK, ET AL.

### ON APPLICATION FOR STAY

[July 14, 2025]

The application for stay presented to JUSTICE JACKSON and by her referred to the Court is granted. The May 22, 2025 preliminary injunction entered by the United States District Court for the District of Massachusetts, case No. 1:25–cv–10601, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

This case arises out of the President's unilateral efforts to eliminate a Cabinet-level agency established by Congress nearly half a century ago: the Department of Education. As Congress mandated, the Department plays a vital role in this Nation's education system, safeguarding equal access to learning and channeling billions of dollars to schools and students across the country each year.

Only Congress has the power to abolish the Department. The Executive's task, by contrast, is to "take Care that the Laws be faithfully executed." U. S. Const., Art. II, §3. Yet, by executive fiat, the President ordered the Secretary of Education to "take all necessary steps to facilitate the closure

of the Department." Exec. Order No. 14242, 90 Fed. Reg. 13679 (2025). Consistent with that Executive Order, Secretary Linda McMahon gutted the Department's work force, firing over 50 percent of its staff overnight. In her own words, that mass termination served as "the first step on the road to a total shutdown" of the Department. Dept. of Ed., Press Release (Mar. 11, 2025); *infra*, at 7.

When the Executive publicly announces its intent to break the law, and then executes on that promise, it is the Judiciary's duty to check that lawlessness, not expedite it. Two lower courts rose to the occasion, preliminarily enjoining the mass firings while the litigation remains ongoing. Rather than maintain the status quo, however, this Court now intervenes, lifting the injunction and permitting the Government to proceed with dismantling the Department. That decision is indefensible. It hands the Executive the power to repeal statutes by firing all those necessary to carry them out. The majority is either willfully blind to the implications of its ruling or naive, but either way the threat to our Constitution's separation of powers is grave. Unable to join in this misuse of our emergency docket, I respectfully dissent.

## I
## A

Federal involvement in education is not a modern phenomenon. For over 150 years, the Federal Government has played a critical role in supplementing and supporting the education provided by States, localities, and private institutions. See S. Tiedt, The Role of the Federal Government in Education 19–24 (1966). In 1979, Congress enacted the Department of Education Organization Act to "strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual." §102(1), 93 Stat. 670. In service of that goal, the Act integrated the Federal Government's educational programs into a new Cabinet-

level agency called the Department of Education. §201, *id.,* at 671.

Congress tasked the agency with administering a broad range of educational programs. For example, the Department runs the federal student financial-aid system, see, *e.g.*, 20 U. S. C. §1071 *et seq.*; §1087a *et seq.*; federal grants for higher education institutions, see, *e.g.*, §§1022a, 1057; federal work-study programs, see §1087-51 to §1087-58; and federal funding for kindergarten through 12th grade, see, *e.g.*, §6301 *et seq.* The scale of these efforts is vast: In June 2025, the Department reported awarding over $120 billion a year in federal student aid to over 13 million students.[1] In 2020–2021, the Federal Government distributed over $100 billion in funding directly to public schools, representing around 11 percent of all funding for public elementary and secondary schools across the country.[2]

Congress has also charged the Department with ensuring equal access to education. See §3402. The Department's Office of Civil Rights, for example, enforces several antidiscrimination laws as to federally funded educational programs, see §§3413, 3441(a)(3), including Title VI, 42 U. S. C. §2000d *et seq.* (prohibiting discrimination on the basis of race, color, and national origin); Title IX, 20 U. S. C. §§1681–1689 (prohibiting discrimination on the basis of sex); and Title II of the Americans with Disabilities Act, 42 U. S. C. §§12101–12103 (prohibiting discrimination on the basis of disability). The Department additionally administers the Individuals with Disabilities Education Act (IDEA), which funds and supports special education services for more than 7 million students with disabilities.[3]

———————

[1] See Dept. of Ed., Federal Student Aid (June 27, 2025), https://www.ed.gov/about/ed-offices/fsa/federal-student-aid.

[2] See App. to Application for Stay of Injunction 7a (App.); National Center for Education Statistics, Public School Revenue Sources (May 2024), https://nces.ed.gov/programs/coe/indicator/cma.

[3] See 20 U. S. C. §§3441(a)(2)(H), 1400–1482; National Association of

Tens of millions of low-income families, too, rely on financial assistance programs administered by the Department under Title I of the Elementary and Secondary Education Act.[4] Put simply, schools and students in every State rely on federal programs established by Congress and run by the Department.

Congress has prohibited the Secretary of Education from "aboli[shing] organizational entities established" in the Department's organic statute. 20 U. S. C. §3473(a)(2). As for statutory entities "transferred to the Department," the Secretary may only "consolidate, alter, or discontinue" a subset of entities specifically identified, after providing Congress with 90 days' advance notice and a "statement of the action proposed . . . and the facts and circumstances relied upon in support of such proposed action." §§3473(b)(1)(A)–(L), (b)(2).

B

Administrations have taken different positions on the Department's value and its proper role in the Nation's system of education over the years. Presidents Carter and Clinton, for instance, made investing in it a priority. See Remarks at the Bill Signing Ceremony for the Department of Education Organization Act, Public Papers of the Presidents, James E. Carter, Jr., Vol. 2, Oct. 17, 1979, pp. 1955–1956 (1980); R. Riley, The Role of the Federal Government in Education, 17 St. Louis U. Pub. L. Rev. 29, 38–39, 43 (1997) (recounting President Clinton's initiatives). President Reagan, by contrast, submitted a proposal to Congress that would have abolished the Department, see State of the Un-

_____

Elementary School Principals, Funding Falls Short for Students With Disabilities (Nov. 20, 2023), https://www.naesp.org/blog/funding-falls-short-for-students-with-disabilities.

    [4] See ESEA Network, About Title I, https://www.eseanetwork.org/about/titlei.

ion Address, 128 Cong. Rec. 159 (1982), though he ultimately withdrew the proposal after it garnered little support in Congress.[5] Until now, however, Presidents have recognized they lack the unilateral authority to eradicate a Department that Congress has tasked with fulfilling statutory duties.

Undeterred by these limits on executive authority, President Trump has made clear that he intends to close the Department without Congress's involvement. During his campaign, Trump repeatedly asserted that he planned to "'clos[e] up the Department of Education'" and "'sen[d] all education and education work . . . back to the states'" "'early in the administration.'"[6] Following the election, Trump continued that refrain: "[Y]ou can do a lot of things without Congress," he told the press, including a "virtual closure of [the] Department of Education."[7] After taking office, President Trump described the Department as a "'big con job'" and reiterated that he would "'like to close it immediately.'"[8]

When nominating Linda McMahon to lead the Department, President Trump announced that he had directed

_____

[5] See Associated Press, Reagan Says He Won't Seek End to Education Dept. Now, N. Y. Times, Jan. 30, 1985, https://www.nytimes.com/1985/01/30/us/reagan-says-he-won-t-seek-end-to-education-dept-now.html.

[6] S. Mphofe, Trump calls to 'Disband' the Department of Education, Fox5 DC (Nov. 13, 2024) (reporting on Sept. 2023 statements); see No. 25–cv–10677, ECF Doc. 1, p. 13 (Original Complaint); see also *ibid.* (collecting Trump's promises to "'eliminate the federal Department of Education'" on the campaign trail).

[7] 2024 Person of the Year Interview With Time, Time, Dec. 12, 2024, https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript; see Original Complaint 13.

[8] No. 25–cv–10601 (D Mass.), ECF Doc. 71–9, p. 3 (M. Bender, Trump Is Said to Be Preparing Order That Aims to Eliminate Education Dept., N. Y. Times, March 6, 2025, https://www.nytimes/com/2025/03/06/us/politics/trump-education-department-executive-order.html). All ECF citations are to No. 25–cv–10601 (D Mass.) unless otherwise specified.

McMahon to "'put herself out of a job.'"[9] Consistent with that directive, on her first day as Secretary of the Department, McMahon issued a memorandum explaining that she would lead the Department's "final mission" and fulfill the President's "campaign promises." App. to State Respondents Opposition to Application to Stay Injunction 58–59 (State Respondents' App.) (capitalization deleted).

On March 11, 2025, about a week into her tenure, McMahon announced a "reduction in force" that would eliminate "nearly 50% of the Department's workforce," slashing the number of employees from 4,133 to 2,183. *Id.,* at 64 (March 11 Directive).[10] The terminations eliminated whole offices and teams within the Department. To take just a few examples, the Directive terminated the entire Office of English Language Acquisition,[11] which Congress tasked with administering the Department's "bilingual education programs," 20 U. S. C. §3420; all employees within the Office of the General Counsel that specialize in K–12 education funding and IDEA grants; 7 of 12 regional divisions of the Office of Civil Rights; most of the Federal Student Aid office responsible for certifying schools so that their students can receive federal financial aid; and the entire unit of the Office of Special Education and Rehabilitative Services charged with providing technical assistance and guidance on complying with the IDEA. Many of the affected offices and functions can be "consolidate[d], alter[ed], or discontinu[ed]" only by Congress. §3473(a). As for the offices the Secretary could lawfully "discontinue,"

---

[9] Z. Wolf, Trump and Musk Are Moving to Smother These Three Pieces of the Government, CNN, Feb. 5. 2025, https://www.cnn.com/2025/02/05/politics/donald-trump-elon-musk-agencies; see ECF Doc. 1, p. 3).

[10] Approximately 600 of these employees took buy outs offered by the Department. State Respondents' App. 65.

[11] Only the Deputy Assistant Secretary, who had previously served in a leadership (*i.e.*, nonstaff) role, and one employee, who had already announced her intention to retire at the end of the month, were left in place. See ECF Doc. 71–60, p. 4, ¶9.

she failed to provide the requisite 90-day notice and report to Congress.  §3473(b).

The March 11 Directive offered competing explanations for the mass terminations.  It touted the initiative as "part of the [Department's] final mission."  State Respondents' App. 64.  Yet it also claimed the initiative reflected a "'commitment to efficiency'" and asserted that the Department would "continue to deliver on all statutory programs that fall under the agency's purview." *Ibid.*  The Department did not explain how terminating half of the agency's work force overnight would improve efficiency, nor how it would be able to continue carrying out its statutory functions.

The reason for that silence soon became apparent.  In statements to the press, McMahon confirmed the reduction in force was "the first step on the road to a total shutdown" of the Department, as directed by the President.[12]  Similarly, when asked during a congressional hearing whether the Department had conducted "an actual analysis to determine what the effects of [the reduction in force] would be" on the Department's ability to carry out its statutory functions, McMahon responded, "No."  Hearing on FY 2026 Dept. of Ed. Budget Request before the Senate Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, Subcommittee on Appropriations, 199th Cong., 1st Sess., Congressional Quarterly Tr. 55 (June 3, 2025).

Internal developments leading up to the mass firings reflected that disregard for the Department's statutory duties.  Certain units within the Department, for instance, were told to prepare a list of statutorily required tasks, but the due date for those reports was March 13, 2025, two days *after* the Department carried out the mass terminations.

---

[12] Fox News, Education Secretary Says Department Took First Steps to Eliminate "Bureaucratic Bloat," at 1:15–1:18, Mar. 11, 2025, https://www.foxnews.com/video/6369901522112.

State Respondents' App. 237.  Terminated employees also reported being immediately "locked out" of most "work systems and documents" on March 11, 2025, making it impossible to hand off existing work to the remaining employees effectively.  *Id.,* at 157; see also, *e.g., id.,* at 240; ECF Doc. 71–54, p. 3; ECF Doc. 71–61, p. 4.  Communications from the Acting Secretary (whom McMahon had replaced), moreover, conveyed that "the Department as an agency was winding down, and would not exist moving forward," so the Department "would not be responsible for meeting the statutory functions [previously] performed" by the fired employees.  ECF Doc. 124–1, p. 6.

On March 20, 2025, President Trump formalized his directive to shutter the Department by signing Executive Order No. 14242.  90 Fed. Reg. 13679.  The order's operative section (titled "Closing the Department of Education and Returning Authority to the States" (italics omitted)), directed the Secretary to "take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities" "to the maximum extent appropriate and permitted by law." *Ibid.*

A day later, President Trump announced that the Department would transfer some of its statutory functions to other Government agencies (March 21 Transfer Order).  Specifically, the Department would "'immediately'" move the student loan portfolio to the Small Business Administration, while "'special needs'" and "'nutrition programs'" would be transferred to the Department of Health and Human Services.[13]

---

[13] App. 59a (quoting L. Cochran, Trump Says Student Loans Moving to SBA, 'Special Needs' to HHS, The Hill, Mar. 21, 2025, https://thehill. com/homenews/education/5207597-trump-student-loans-sba-special-needs-disabled-students-hhs-mcmahon-kennedy).

### C

#### 1

Following the March 11 Directive and the resulting mass termination of Department employees, a group of 20 States and the District of Columbia sued the Department in federal court. They argued that the reductions in force "effective[ly] dismantl[ed] the Department" and "incapacitat[ed] components of the Department responsible for performing functions mandated by statute." ECF Doc. 1, p. 2. According to the States, that unilateral executive action violated the Constitution's separation of powers, the Take Care Clause, and the Administrative Procedure Act. Later that month, a group of school districts and unions filed a similar suit challenging the March 11 Directive, as well as Executive Order No. 14242 and President Trump's March 21 Transfer Order. The District Court consolidated the cases, and both sets of plaintiffs sought preliminary injunctions to preserve the status quo while litigation remained ongoing.

Dozens of affidavits from Department officials and federal funding recipients, filed in support of the plaintiffs' preliminary injunction motions, described the mass termination's effects on schools and students across the Nation. School districts, one such affidavit averred, depend on timely disbursement of federal funds to pay teachers and to purchase materials and equipment throughout the academic year. Even short-term delays in funding can force school districts "to make cuts . . . to staff and programs, disrupting services for students and families." App. to Opposition of Somerville Public Schools et al. to Application for Stay 57a–58a. Indeed, by the time they filed suit, several States had already experienced delays related to federal reimbursements following the March 11 Directive. See App. 64a. Officials at schools and universities likewise attested that they rely on timely certifications from the Department to enroll students on federal financial aid. As a result of

certification delays following the reduction in force, academic institutions have been or will be forced to turn away whole swaths of prospective students.

Scores of officials who worked at the Department also attested that the agency would no longer be able to carry out many of its statutorily mandated duties following the mass termination. See, *e.g.*, ECF Doc. 71–54, p. 4 (Title II of the Workforce Innovation and Opportunity Act functions); ECF Doc. 71–60, p. 5 (Title III of the Elementary and Secondary Education Act of 1965 functions); ECF Doc. 71–61, p. 5 (Federal Student Aid office functions); ECF Doc. 71–64, p. 5 (Education Sciences Reform Act functions); ECF Doc. 71–66, p. 2 (Office of General Counsel functions); see also ECF Doc. 71–46, p. 5 (Former Secretary of the Department attesting "the Department cannot meet its statutory obligations at the levels of staffing proposed by the Defendants").

The Government, for its part, submitted no evidence to rebut the factual record compiled by the plaintiffs. Nor did it argue that the Executive could singlehandedly abolish the Department. Instead, it asserted that the mass termination fell within the President's authority because it was simply part of an effort to "streamlin[e]" the Department. App. 118a.

2

The District Court granted the preliminary injunction motion. The court found that "the record abundantly reveals that Defendants' true intention is to effectively dismantle the Department without an authorizing statute," and that the terminations would prevent the Department from "carry[ing] out its statutory functions." *Id.,* at 2a–3a. That unilateral executive action, the District Court concluded, likely violated the separation of powers and the Take Care Clause. *Id.,* at 48a. The court further determined that the Department had acted arbitrarily and capriciously, in violation of the Administrative Procedure Act, by

failing to provide a reasoned explanation for the termina-
tions. *Id.,* at 60a. Accordingly, the District Court enjoined
the Government from carrying out the March 11 Directive,
Executive Order No. 14242, and the March 21 Transfer Or-
der. It also ordered the Department to "reinstate federal
employees" terminated pursuant to the March 11 Directive
"to restore the Department to the status quo such that it is
able to carry out its statutory functions." *Id.,* at 88a.

The First Circuit denied the Government's request to
stay the District Court's preliminary injunction pending ap-
peal. The Government, the First Circuit concluded, "d[id]
not even attempt to engage with the District Court's record-
based findings about the extent of the [reduction in force],"
"the intent behind both it and the transfer of functions to
shut down the Department," or "the disabling impact of
those actions on the Department's ability to carry out stat-
utorily assigned functions." *Id.,* at 163a. The First Circuit
also noted that the plaintiffs faced serious irreparable
harms from the "Department's inability to provide its stat-
utorily mandated services." *Id.,* at 171a.

## II

Rebuffed twice below, the Government now tries its hand
at seeking emergency relief from this Court. Granting such
relief is a matter of this Court's discretion, which we have
previously exercised "only under extraordinary circum-
stances." *Ruckelshaus* v. *Monsanto Co.*, 463 U. S. 1315,
1316 (1983) (Blackmun, J., in chambers). An applicant
bears an "especially heavy burden" to justify our interven-
tion where, as here, the matter remains pending before the
Court of Appeals, and two lower courts have already denied
interim relief. *Packwood* v. *Senate Select Comm. on Ethics*,
510 U. S. 1319, 1320 (1994) (Rehnquist, C. J., in chambers).
Ordinarily, the Court considers the applicant's likelihood of
success on the merits of an appeal to this Court, the balance

of the equities, and the likelihood of irreparable harm absent emergency intervention. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); *Nken* v. *Holder*, 556 U. S. 418, 434 (2009).

### A

### 1

The Government's arguments stumble from the start. In our constitutional order, Congress "makes laws" and the President "'faithfully execute[s]' them." *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 327 (2014) (quoting U. S. Const., Art. II, §3; alteration in original). "The Founders of this Nation entrusted the lawmaking power to the Congress alone," *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 589 (1952), and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton* v. *City of New York*, 524 U. S. 417, 438 (1998).

The President thus lacks unilateral authority to close a Cabinet-level agency. Congress created the Department, and only Congress can abolish it. The President, too, may not refuse to carry out statutorily mandated functions assigned to the Department, for he must "take Care that the Laws be faithfully executed." Art. II, §3.

Rather than contest these bedrock principles, the Government below contended that the mass terminations were not part of any planned closure, but instead simply intended to "cut bureaucratic bloat." App. 118a. The record unambiguously refutes that account. Indeed, as described above, neither the President nor Secretary McMahon made any secret of their intent to ignore their constitutional duties. President Trump repeatedly called for the immediate abolition of the Department both during his campaign and after taking office. See *supra*, at 4–5. He directed McMahon to "'put herself out of a job'" on the day of her nomination, *supra*, at 5, and he formalized that mandate in

an Executive Order, commanding McMahon to "facilitate the closure of the Department of Education," 90 Fed. Reg. 13679. Consistent with that directive, McMahon vowed to oversee the Department's "final mission." *Supra*, at 5. Rather than wait for legislative action to begin shuttering the Department, McMahon slashed the agency's work force in half, concededly without analyzing the effect of those terminations on the Department's statutorily mandated functions. See *supra*, at 5–7.

These actions had their desired effect: As the District Court expressly found, "the Department will not be able to carry out its statutory functions[,] and in some cases, is already unable to do so," as a result of the mass terminations. App. 3a. Mandatory statutory duties, including the administration of federal student aid programs, grants for K–12 education, IDEA, and English language programs, and the enforcement of civil rights laws, are all at risk or currently compromised, the District Court determined. See *supra*, at 6–7, 9–10; App. 3a, 22a–24a, 74a–75a, 79a–80a.

The record evidence credited by the District Court and unrebutted by the Government thus leads to one conclusion: The Executive has seized for itself the power to repeal federal law by way of mass terminations, in direct contravention of the Take Care Clause and our Constitution's separation of powers.

The Secretary, moreover, unquestionably exceeded Congress's statutory limits on her authority to reorganize the Department. Congress has barred the Secretary from "alter[ing]" functions assigned to the Department by its organic statute and from "abolish[ing] organizational entities" established by law. 20 U. S. C. §3473(a). The Secretary's failure to preserve statutorily mandated functions, see App. 3a, contravened that statutory constraint. As for the limited subset of offices the Secretary may lawfully "discontinue," §3473(b), moreover, she made no attempt to provide the requisite 90-day notice and report to

Congress.[14]

This is not to say the Executive may never lawfully streamline an agency's work force or restructure its discretionary components, in accordance with law. Cf. *Trump* v. *American Federation of Government Employees*, 606 U. S. ___, ___ (2025) (SOTOMAYOR, J., concurring in grant of stay) (slip op., at 2). Indeed, as to the Department, Congress has provided clear instructions about how an Executive may lawfully consolidate or discontinue certain specified offices within the agency. See §3473(b). What the Executive Branch may not do, however, is usurp the power to repeal laws by firing all those necessary to carry them out.

2

Before this Court, the Government does not defend the lawfulness of its actions. Rather, in a now-familiar move, it presents a grab bag of jurisdictional and remedial arguments to support its bid for emergency relief. None justifies this Court's intervention.

The Government first contends that the plaintiffs failed to demonstrate an "'actual or imminent'" harm fairly traceable to the March 11 Directive. Application to Stay Injunction 15 (quoting *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 381 (2024)). Any harms to the plaintiffs from

—————

[14] The Department additionally violated the Administrative Procedure Act by failing to provide a "reasoned explanation" for the mass terminations. *Department of Commerce* v. *New York*, 588 U. S. 752, 785 (2019). An agency fails to satisfy that requirement where it proffers only pretextual justifications for its decisions. See *ibid.* For the reasons explained, the agency's stated rationale for the mass terminations (to "curb inefficiency," Application to Stay Injunction 7; see App. 118a) is plainly pretextual. As this Court has said before, "[o]ur review is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Department of Commerce*, 588 U. S., at 785. Only by ignoring the record and jettisoning common sense could a court accept the Government's efficiency rationale as a "genuine justificatio[n]" for the March 11 Directive. *Ibid.*

the Department's mass termination are simply "'too speculative'" to support Article III standing, the Government says. Application to Stay Injunction 15.

That claim is belied by both the record and common sense. The plaintiff States, schools, and unions rely on a range of Department services that support their operations and allow them to receive federal funding. Dismantling those services has jeopardized funding streams and required schools to divert resources to fill the gaps, causing concrete monetary damages and operational harm to plaintiffs. Record evidence, moreover, supports the inference that slashing the Department's work force by half without any apparent plan to ensure that the Department continues to meet its statutory obligations will imminently cause (and in some cases has already caused) such a degradation in services.

Take, for instance, the federal student aid program. Under federal law, a college or university may participate in federal student aid programs only if it has a "program participation agreement" with the Department and meets eligibility standards. See 20 U. S. C. §§1094, 1099c, 1099c–1. When a school wants to accept students eligible for federal financial aid, it must receive an initial certification from the Department and then be recertified regularly. State Respondents' App. 156–157. If a school is due for (re)certification, even months-long delays in the certification process can hobble the school's ability to enroll students who depend on federal financial aid.

Unsurprisingly, the mass termination of Department employees, including most of the Department staff that handles certifications and recertifications, has already resulted in harms to institutions seeking to enroll students on financial aid. The State plaintiffs submitted affidavits showing that a technical college in Washington State, for instance, did not receive recertification for one of its campuses in time for the start of the spring 2025 semester. App. 71a; State

Respondents' App. 133–136.  Although, in the past, it took less than 7 weeks to approve recertification applications, the Department took 18.5 weeks to approve the application.  See App. 71a.  As a result, the school was forced to forgo admitting students eligible for federal financial aid, and the total enrollment for the term was less than one-fifth of the expected size, costing the college lost tuition funds.  State Respondents' App. 135.  That type of pocketbook harm is a prototypical Article III injury.  See, *e.g.*, *Czyzewski* v. *Jevic Holding Corp.*, 580 U. S. 451, 464 (2017).  Other schools run by the State plaintiffs undoubtedly share this experience.

That showing is sufficient for the lawsuit to proceed.  See *Town of Chester* v. *Laroe Estates, Inc.*, 581 U. S. 433, 439 (2017) (recognizing that "[a]t least one plaintiff must have standing" to seek the requested relief for a case to proceed).  But it is only one of several concrete examples of harm fairly traceable to the mass terminations.  To mention just two more, the District Court detailed evidence of delays in federal funding attributable at least in part to the reduction in force.  For instance, the New York State Education Department, which is "currently administering $15.7 billion in federal funding from the Department," has been "experiencing drawdow[n] delays" for certain federal funding reimbursements "since the [reduction in force] announcement."  App. 64a.  The New Jersey Department of Education, similarly, "received a notice to expect delays in connecting to a live help desk agent because of severe staffing restraints when attempting to view and withdraw federal funds to use for its programs and to pay vendors."  *Ibid.* (internal quotation marks omitted).  And the Illinois State Board of Education "has been unable to access certain categories of funding since March 1, 2025," in the lead up to the reduction in force.  *Ibid.*

The March 11 Directive, moreover, has led to the full closure of certain offices that provide critical services to plain-

tiffs. The Office of English Language Acquisition, for instance, has been "completely abolished and staff from [a separate office] are absorbing statutorily required work," *id.,* at 73a, despite statutory limits on the Secretary's ability to "discontinue" that office, see 20 U. S. C. §3473(b)(1)(A). The District Court found that the "closure" of that office will "irreparably harm Plaintiffs' ability to serve their English language learners" by disrupting funding streams and creating delays in the provision of services, see App. 73a, and the Government offers no reason to believe that finding is clearly erroneous. The Government's standing argument thus provides no legitimate basis for the majority's decision to issue emergency relief.

The Government's remaining arguments are even less persuasive. The Government claims that the Civil Service Reform Act of 1978 divests the District Court of subject-matter jurisdiction over this suit because it channels claims regarding personnel decisions exclusively through the Merit System Protection Board and the Federal Labor Relations Authority. Application to Stay Injunction 8, 25–26 (citing 5 U. S. C. §§7105(a)(2), 7512, 7513(d), 7701). Plaintiffs, however, are not challenging individual employment decisions, nor are they suing for the benefit of individual Department employees. Rather, they are challenging the effective dismantling of the Department itself. Cf. *Axon Enterprise, Inc.* v. *FTC*, 598 U. S. 175, 189 (2023) (recognizing it would be "surprising" if challenges regarding "the structure or very existence of an agency" had to proceed through a specialized statutory review scheme designed for challenges to specific agency decisions, like "firing an employee").

The Government lastly challenges components of the District Court's remedial order. In particular, the Government contends the District Court lacked authority to order reinstatement of the fired employees and, alternatively, that

the reinstatement order is overbroad because it is not ade-
quately tailored to restore the particular Department func-
tions upon which the plaintiffs rely.  See Application to Stay
Injunction 30–34.  The Government, however, failed to
raise the former argument before the District Court, and
therefore forfeited it, as the First Circuit recognized.  See
App. 166a.  As to the latter argument, which the Govern-
ment meaningfully raises for the first time here, the proper
course is to leave questions of "whether a narrower injunc-
tion is appropriate" to the lower courts in the "first in-
stance." *Trump* v. *CASA, Inc.*, 606 U. S. ___, ___ (2025) (slip
op., at 19).  At bottom, the Government's late-raised reme-
dial arguments cannot justify lifting the preliminary in-
junction in its entirety, as the majority does today.  That
ruling facilitates the Executive's power grab by permitting
the mass terminations to go into effect wholesale, even as
some narrower remedy may be appropriate.

### B

The equities, too, cut against the Government.  While
"'equity does not demand that its suitors shall have led
blameless lives'" as to other matters, "it does require that
they shall have acted fairly and without fraud or deceit as
to the controversy in issue." *Precision Instrument Mfg. Co.*
v. *Automotive Maintenance Machinery Co.*, 324 U. S. 806,
814–815 (1945) (citing *Keystone Driller Co.* v. *General Ex-
cavator Co.*, 290 U. S. 240, 245 (1933)).  The Government
has continued to press a plainly pretextual explanation for
the mass firings in court, even as the Executive makes in-
consistent statements to the public.  See *supra*, at 12–13,
and n. 14.  That the majority sees fit to repay that obfusca-
tion with emergency equitable relief is troubling.

The relative harms to the parties are also vastly dispro-
portionate.  While the Government will, no doubt, suffer
pocketbook harms from having to pay employees that it
sought to fire as the litigation proceeds, see App. 169a–

SOTOMAYOR, J., dissenting

170a, the harm to this Nation's education system and individual students is of a far greater magnitude. The Department is responsible for providing critical funding and services to millions of students and scores of schools across the country. Lifting the District Court's injunction will unleash untold harm, delaying or denying educational opportunities and leaving students to suffer from discrimination, sexual assault, and other civil rights violations without the federal resources Congress intended. The majority apparently deems it more important to free the Government from paying employees it had no right to fire than to avert these very real harms while the litigation continues. Equity does not support such an inequitable result.

\*     \*     \*

The President must take care that the laws are faithfully executed, not set out to dismantle them. That basic rule undergirds our Constitution's separation of powers. Yet today, the majority rewards clear defiance of that core principle with emergency relief. Because I cannot condone such abuse of our equitable authority, I respectfully dissent.